## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**KEVIN MORSE,**

      **Plaintiff,**

      **v.**

**FIFTY WEST BREWING
COMPANY LLC, *et al.*,**

      **Defendants.**

**Case No. 1:21-cv-377**

**JUDGE DOUGLAS R. COLE**

## OPINION AND ORDER

Before the Court is Plaintiff Kevin Morse's Motion for Class Certification (Doc. 40), which asks the Court to certify a class of employees of Defendants Fifty West Brewing Company LLC, and co-owners Robert Joseph Slattery and Robert James Slattery[1] (collectively Fifty West) under Federal Rule of Civil Procedure 23(b)(3). The proposed class members worked at Fifty West's restaurants during the COVID-19 pandemic and were allegedly denied tips they were owed. (Compl., Doc. 1). The Court conditionally certified a collective action under the Federal Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq.*, on the parties' joint stipulation. (Doc. 29). Morse's motion seeks a parallel class certification for his Ohio law claims. For the reasons stated below, the Court **DENIES** Morse's Motion for Class Certification (Doc. 40).

---

[1] The Complaint had erroneously denominated Robert Joseph Slattery as "Robert J. Slattery, Jr.," and Robert James Slattery as "Robert J. Slattery, Sr." (Doc. 6, #23 nn. 1–2). These two individuals appear to be father and son. Although he partly owned Fifty West, Robert Joseph Slattery, unlike his father, also directly managed its work staff. (*Id.* ¶¶ 21–24, #27). To avoid confusion, the Court will refer to these individuals by their first and middle names.

But as it reaches this disposition based on the lack of evidence, Morse may again move for certification on a more developed record.

## BACKGROUND

Fifty West owns and operates a brewpub in Cincinnati, Ohio, as well as two "Burger Bar" restaurants in Cincinnati and Chillicothe, Ohio. (Doc. 1 ¶¶ 11, 26, #3, 6; Answer, Doc. 6 ¶ 11, #25). Morse worked for Fifty West, at a minimum, from April 15, 2019, until March 15, 2020, and from May 6, 2020, until August 5, 2021, primarily as a bartender. (Doc. 6 ¶ 8, #25; Doc. 42-1, #343; *but see* Doc. 17-1, #105–06 (Morse's stating he worked "[b]etween March 2020 and May 2020")).

The heart of this dispute turns on the tip compensation structure Fifty West allegedly used at the time Morse worked there. As intimated above, his period of employment coincides with the outbreak of the COVID-19 pandemic and the shift of many bars and restaurants to take-out and outdoor or spaced-out dining models. (Doc. 42-1, #343–44). At first, in response to the pandemic, Fifty West laid off all hourly employees for the period between March 16, 2020, and April 25, 2020, during which time it employed a purely takeout model run by the few non-tipped workers still employed. (*Id.*). Then, from April 25, 2020, until May 9, 2020, Fifty West employed only 12 hourly workers. (*Id.* at #344). These employees interfaced with customers, processed orders, and were paid "at or above Ohio's minimum wage," but allegedly were not given tips solicited and accepted from customers. (Doc. 1 ¶¶ 29–30, #6; Doc. 6 ¶¶ 29–30, #28–29 (admitting that tips were left but denying that any were withheld from employees)).

2

With the country still in the throes of the pandemic, Fifty West rehired its former hourly employees and trained them to handle the pandemic-adjusted dining experience to increase foot-traffic and the volume of business its restaurants were doing. (Doc. 1 ¶ 33, #7; Doc. 42-1, #344). These rehired employees wore multiple hats—both performing standard hourly, tipped work at the "front of the house" and picking up the slack in the un-tipped "back of the house" work. (Doc. 6 ¶ 33, #29–30; Doc. 17-1, #106; Doc. 42-1, #344). As a result of this new workplace structure, Fifty West created a tip pool for each shift and, rather than paying each hourly employee the minimum wage directly, Fifty West used a tip-credit to fulfill its wage obligations.[2] (Doc. 1 ¶¶ 33, 35, #7; Doc. 42-1, #344). The parties dispute whether the tip sharing structure was voluntary and whether the tip distribution percentages were discretionary or fixed. (*Compare* Doc. 1 ¶¶ 35–37, *and* Doc. 17-1, #106 *with* Doc. 42-1, #344). Morse alleges that Fifty West's pooling of tips among those entitled to receive them and those who were not in conjunction with its use of a tip-credit system violated state and federal wage laws because the resulting pay structure undercompensated Morse and the other hourly workers. (Doc. 1, #11–13).

Incensed by this alleged under-compensation, Morse sued Fifty West, its co-owners, and New Brothers Brewing, LLC, (a former alter-ego of Fifty West), on June 4, 2021. (Doc. 1, #1; Doc. 27, #172). In his Complaint, Morse signaled his intent to pursue both an FLSA collective action and a class action based on four Ohio law

---

[2] Tip credits permit "employers to pay less than [the] minimum wage [by] … includ[ing] in [the] calculation of a 'tipped employee's' wage the amount that an employee receives in tips." *Kilgore v. Outback Steakhouse of Fla., Inc.*, 160 F.3d 294, 298 (6th Cir. 1998).

claims.[3] On August 6, 2021, Fifty-West and its co-owners answered the Complaint denying liability, (Doc. 6), and Fifty West's former alter-ego moved to dismiss the claims against it, (Doc. 9). The Court ultimately granted the alter-ego's motion on March 31, 2022, and dismissed it from the case because the alter-ego and Fifty West were one and the same, so claims against the alter-ego duplicated those raised against Fifty West. (Doc. 27, #172). Soon after, on April 6, 2022, the Court conditionally certified Morse's requested FLSA collective action in light of the parties' joint stipulation to that effect. (Doc. 29). Morse's counsel has received around 50 opt-in plaintiffs for the collective action. (Doc. 40, #306 (citing Docs. 32–34)).

Only several weeks into discovery (after an attempt to resolve the matter solely as an FLSA collective action bore no fruit), (3/31/23 Min. Entry; 5/31/23 Min. Entry; Doc. 38), Morse moved to certify a class action for all four of his state-law claims under Rule 23(b)(3), (Doc. 40, #301). He argued Rule 23 is met here by relying almost exclusively on his October 1, 2021, affidavit, (Doc. 17-1), the parties' stipulation that

---

[3] The Complaint lists six claims for relief. The first two are brought under the FLSA—Count 1 for failing to give hourly employees tips they were owed generally, and Count 2 for the allegedly unlawful tip pool occasioned by Fifty West's alleged sharing of tips among both tipped and non-tipped staff. (Doc. 1, #10–11). The remaining four are state-law claims. Count 3 is brought directly under Article II, § 34a of the Ohio Constitution for an allegedly illegal, compulsory tip-pooling arrangement, (*Id.* at #11–12). Ohio Const., art. II, § 34a (authorizing expressly "action[s] for equitable and monetary relief … in any court[s] of competent jurisdiction"); *Haase v. Cameron Mitchell Rests., LLC*, No. 2:23-cv-1316, 2024 WL 23159, at *10–*11 (S.D. Ohio Jan. 2, 2024) (noting that § 34a is self-executing). Count 4, brought under Ohio Revised Code § 4113.15, is for Fifty West's failure to pay all tips owed on time by withholding them. (Doc. 1, #12–13). Counts 3 and 4 are analyzed under the same framework as the FLSA. *Haase*, 2024 WL 23159, at *10; *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 385 n.1 (6th Cir. 2016). Count 5 is Morse's demand for "exemplary and punitive damages" under Ohio Revised Code § 2307.60 for Fifty West's purportedly criminal, willful violations of the FLSA. (*Id.* at #13–14). And Count 6 is for unjust enrichment on account of Fifty West's allegedly unlawful retention of tips. (*Id.* at #14).

Fifty West employed about 150 individuals "as bartenders, cashiers, and expos from March 2020 to June 5, 2021," (Doc. 39-1), and argument premised on non-admitted allegations in the Complaint. (*See* Doc. 40). According to Morse, this (thin, verging on non-existent) evidentiary record supports certification of a class of "[a]ll hourly employees who customarily and regularly received tips that worked for Defendants at any time between March 1, 2020, and June 5, 2021." (*Id.* at #303). And he also moves the Court to certify the following subclasses:

> Class Action Subclass 1: All hourly employees who have been employed by Defendants as a bartender, cashier, or utility at any time between March 16, 2020, and May 9, 2020, during which time Defendants paid the minimum wage and during which time the employee did not receive all of the tips to which the employee was entitled.

> C[lass] Action Subclass 2: All tip-credited employees (i.e., any employee who received a tip-credit wage, or in other words an hourly rate below the federal and state minimum wage, and as to whom the employer was relying on a tip credit (which is lawful to make up the difference between the hourly rate and the federal and state minimum wage)[)] who have been employed by Defendants at any time between May 10, 2020, and June 5, 2021, who participated in a tip pool with employees who do not customarily and regularly receive tips and/or who did not receive all of the tips to which they were entitled.

(*Id.* at #303–04). Fifty West opposed by underscoring (1) the lack of evidentiary support, (Doc. 42, #332–34), (2) the potential individualized issues that would arise were the Court to accept Morse's proposed class and subclasses, (*id.* at #334–38), and (3) an issue relating to the size of the first proposed subclass under Rule 23(a)(1), (*id.* at #338–39), among other assorted problems arising from the requirements of Rule 23(a), (*id.* at #339–41).

Morse replied contesting Fifty West's legal arguments. (Doc. 45). Taking note of Fifty West's evidentiary objection, Morse took it upon himself to find additional

evidence—ignoring the fact that Fifty West would be unable to respond. In support of his reply, Morse filed his own declaration, (Doc. 44-1, #349), which purports to lay a foundation for what looks like a partially cropped set of slides from a presentation relating to Fifty West—a document that lacks signifying date markers or details about its author, (*id.* at #350). And Morse included a sworn declaration from Jack Hughes, another employee of Fifty West, (Doc. 44-2, #351), which lays a foundation for an email sent by "Bobby Slattery"—presumably Robert Joseph Slattery, who managed employees directly, (Doc. 6 ¶¶ 21–22, #27)—which outlines a proposed Fifty West employee tip pool, (Doc. 44-2, #352–54). Hughes's declaration also includes his assertion that, when he worked as a bartender for Fifty West from 2020 until 2021, he was forced to participate in a tip pool to which he did not consent. (*Id.* at #351).

With that, the matter is ripe for the Court's review.

## LEGAL STANDARD

A class action represents "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (citation omitted). To justify departing from the typical named-parties-only rule, a putative class representative must make certain showings. First, under Federal Rule of Civil Procedure 23(a), he must show that: (1) the class is so numerous that joinder is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative are typical of the claims or defenses of the class (typicality); and (4) the representative will fairly and adequately protect the interests

of the class (adequacy). Fed. R. Civ. P. 23(a). These requirements limit the potential abuse of the class action mechanism by ensuring class claims are "fairly encompassed by the named plaintiff's claims." *Dukes*, 564 U.S. at 349 (citation omitted).

Beyond satisfying the four Rule 23(a) factors, a putative class also must meet a Rule 23(b) provision. Here, Morse moves for certification pursuant to Rule 23(b)(3), which requires consideration of two issues—predominance and superiority. As to the former, the Court must "find[] that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). This "predominance" inquiry is akin to, but "more stringent" than, Rule 23(a)(2)'s "commonality" requirement, with predominance said to "subsume[]" or to "supersede[]" commonality. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609 (1997). Superiority, on the other hand, requires the Court to assess whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This "superiority" requirement aims to "achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615 (quoting Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment). Rule 23(b)(3) lists four non-exhaustive factors "pertinent" to the "predominance" and "superiority" analyses: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions," (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members," (3) "the desirability or

undesirability of concentrating the litigation of the claims in the particular forum," and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)–(D).

Whether a court properly certifies a class is separate from whether the putative class, as defined, will succeed on the merits of the claims. For this reason, a class "cannot be defined" such that whether an individual constitutes a class member cannot be established "until the case is resolved on its merits." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012). This implicit ascertainability requirement ensures "the class definition [is] … sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Id.* at 537–38 (citation omitted). That said, though the Court does not adjudicate the merits of a claim, "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (cleaned up). Indeed, the Supreme Court has directed courts to undertake a "rigorous analysis" before certifying a class. *Id.* at 33–34 (quoting *Dukes*, 564 U.S. at 351). Thus, the party seeking certification bears the burden of proving via an evidentiary showing that certification is proper. *Young*, 693 F.3d at 537 (noting a district court would err if it certified a class based only on allegations); *Comcast*, 569 U.S. at 33 (explaining that the provisions of Rule 23 must be "satisf[ied] through evidentiary proof"). At bottom, a "district court has broad discretion to decide whether to certify a class." *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 850 (6th Cir. 2013).

## LAW AND ANALYSIS

Before diving headfirst into the Rule 23 analysis, the Court pauses to address the evidentiary record. Morse's motion relies largely on the parties' stipulation and his affidavit filed two years prior as the evidence justifying certification.[4] No other evidence was proffered in support of certification until *after* Fifty West responded, when Morse filed two declarations with his reply. Such late-filed evidence is not properly before the Court. *SAT Tech., Inc. v. CECO Env't Corp.*, No. 1:18-cv-907, 2023 WL 6119934, at *3 n.7 (S.D. Ohio Sept. 19, 2023). Namely, Morse's raising *new evidence* apparently material to his arguments for certification for the first time in his reply was procedurally improper because doing so "vitiated" Fifty West's "ability to respond to the new evidence" as the non-movant. *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 481 (6th Cir. 2003). As a result, the Court need not and will not consider such tardy evidence in evaluating the certification motion.[5]

---

[4] Morse also references the allegations in his unverified Complaint. But as the Court has stated previously, "well-settled caselaw has made [it] abundantly clear [that] allegations are not evidence"—a point that should not need repeating. *Combs v. Wal-Mart, Inc.*, No. 1:21-cv-670, 2024 WL 555913, at *5 n.2 (S.D. Ohio Feb. 12, 2024).

[5] That said, the newly surfaced evidence would not carry the day. First, the two declarations do not incorporate any of Fifty West's time-keeping records. As explained, those records are necessary to assess whether individualized questions will arise and predominate in a class-wide setting when the Court calculates how much time employees (who were performing both tipped and non-tipped work) dedicated to tasks for which tips are owed. *See infra* Section B.3. In addition, neither declaration speaks directly to whether the other proposed class members are similarly situated. That is a glaring hole in the current record given typicality, commonality, and predominance under Rule 23 cannot be satisfied unless the proposed class members are similarly situated to each other and to the named plaintiff. *See infra* Part A. The declarations also imply that the tip-pooling arrangement was compulsory for all employees by suggesting that no other employee consented to participate in the pool. But the declarants would not normally know such details, and they do not explain how they came by the knowledge that *other* employees did not agree to pool their tips. *Gonzalez v. Parker Hannifin Corp.*, No. 2:18-cv-212, 2020 WL 13698922, at *3 (E.D. Tenn. Nov. 16, 2020).

## A.    Lack of Evidence

The most pressing issue with Morse's motion for certification is his paltry evidentiary showing. As noted above, Morse cites the parties' stipulation that Fifty West employed about 150 tipped workers at the relevant time, (Doc. 39-1); Morse's affidavit discussing his personal experience working at Fifty West where he claims he did not receive the tips he was owed, (Doc. 17-1, #106); and the averments in his Complaint that the proposed class members were harmed in the same manner, (Doc. 1, #8–14). (*See* Doc. 40, #308–17). But this "evidence" does not suffice for the rigorous analysis that must be conducted at this stage.

First, the parties' stipulation to the size of the proposed class demonstrates only that the numerosity requirement is met for the overall class—nothing more.

Morse's affidavit, which must be based on personal knowledge, *Combs v. Wal-Mart, Inc.*, No. 1:21-cv-670, 2024 WL 555913, at *3 (S.D. Ohio Feb. 12, 2024), similarly does not do as much work as Morse thinks. It certainly speaks to Morse's personal experience as a Fifty West bartender and his individual claim of underpayment. (Doc. 17-1, #106 ("I did not receive any portion of th[e] tips" left by take-out customers [in May 2020]. … [I] w[as] forced to participate in the tip pool with [non-tipped] employees [from May 2020 until July 2021] … [and] did not receive the tips left by customers on those [take-out] orders.")). But that is the extent of its

---

Finally, the slides and email that Hughes and Morse sought to introduce are not beyond challenge—neither clearly identifies the author (no explanation is given as to whether Bobby Slattery refers to one of the Defendants), and Morse does not explain in what context he was given or had access to the partially cropped slides purporting to detail a tip-pooling structure employed by Fifty West. (*See* Doc. 44-1, #350; Doc. 44-2, #351–54).

usefulness. Morse does not explain how he knew his co-workers also did not receive tips they were allegedly owed. Others' compensation would ordinarily be beyond Morse's personal knowledge, and his assertions about their pay, without elaborating on what informed his "understanding," amount to mere speculation. *Gonzalez v. Parker Hannifin Corp.*, No. 2:18-cv-212, 2020 WL 13698922, at *3 (E.D. Tenn. Nov. 16, 2020) (finding certain paragraphs in an affidavit were speculative and beyond the affiant's personal knowledge because plaintiff had not explained how she knew the breaks taken by others were generally known to be unauthorized). So the affidavit cannot suffice to establish commonality or predominance—to say nothing of its overall failure to identify other characteristics of proposed class members that render them similarly situated.

Finally, Morse's retreat to his allegations cannot satisfy the evidentiary burden required for certification. *Bond v. Antero Res. Corp.*, 328 F.R.D. 187, 196 (S.D. Ohio 2018). This limited evidentiary record regarding the proposed class and subclasses thus creates an insurmountable obstacle to certification for now.

Admittedly, Morse cites certain averments in Fifty West's answer in the background section of his brief in support of certification. (Doc. 40, #304–06). But the portions of the answer to which Morse points merely recite general facts about Fifty West's operations: Fifty West's employees handled to-go orders during the early days of the pandemic at which time tips were left by customers, (*id.* at #304–05); Fifty West asked employees to perform a variety of tipped and non-tipped work when it started to offer limited in-person dining, (*id.* at #305–06); and Fifty West paid hourly

11

employees using tip credits starting in May 2020, (*id.* at #306). While relevant, these facts are not that useful for the issue before the Court today as they do not explain whether proposed class members are similarly situated. For example, that Fifty West had tipped employees perform various tasks and paid them using tip-credits for some time does not answer whether class members are still owed tips or whether they consented to Fifty West's tip-pooling arrangement. In addition, these facts neither explain how one could infer that Fifty West's employees were undercompensated nor identify characteristics of the class showing why their wage claims share common questions of law and fact.

Simply put, the dearth of evidence leaves the Court without a basis to understand who the proposed class members are or on what basis they could claim that they have similar under-compensation claims that should be adjudicated on a class-wide basis. Instead, the Court is left with a host of unanswered questions: Did all hourly workers perform multiple tasks including tip and non-tipped work? Was there a uniform practice of timekeeping to ensure that tipped and non-tipped work could be recorded separately? Did the need to switch between tasks arise on an ad hoc basis such that it was impracticable for workers to keep reliable time-records of the time they spent on tipped versus non-tipped work? What were employees told by management about the May 2020 tip-pooling arrangement? If tip pooling included staff who were not usually tipped, was that because hourly employees performed untipped kitchen work beyond their regular tipped work (i.e., the "kitchen" staff who participated in the pool were in fact hourly employees who worked part-time in the

kitchen)? Did management discuss tips with all class members in a company-wide setting or on individual basis? Did employees individually consent to tip pooling before the pool was implemented? Were they allowed to opt out of the arrangement after the fact? Pure speculation about the class abounds—and such conjecture does not cut it for the "rigorous analysis" required at this stage of the litigation. *Bond*, 328 F.R.D. at 196.

It is no answer that Morse's affidavit provides the requisite details, as Morse tries to argue. (Doc. 45, #356). Again, an affidavit holds evidentiary weight only when it is based on personal knowledge. Because Morse cannot speak to details relating to the employment and compensation records of others without explaining how he knows those details, his affidavit cannot move the needle. *Combs*, 2024 WL 555913, at *3; *Gonzalez*, 2020 WL 13698922, at *3. Nor can Morse claim to have carried his evidentiary burden by arguing Fifty West "ha[s] failed to rebut [Morse's] affidavit with factual assertions." (Doc. 45, #356–57). Morse bears the burden to offer affirmative evidence that certification is warranted. *Young*, 693 F.3d at 537. His failure to do so means Fifty West need not explain why certification is improper.

Accordingly, the Court denies Morse's motion as premature—Morse currently lacks the proper evidentiary support for certification.

### B. Other Issues Lurking in the Background

Because the Court finds that the evidentiary record cannot support the motion for certification, the Court need not tread further. That said, the Court notes several other issues with the proposed class and subclasses likely to arise again if Morse later

moves for certification. Discussing these issues now will enable the parties to tailor discovery and any future briefing accordingly.

### 1. Subclass Definitions

Start with Morse's subclass definitions. A certified class must be ascertainable: presence in the class cannot turn on the merit of an individual's claim. *Randleman v. Fid. Nat'l Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011) (holding courts may not define a class such that "[e]ither the class members win or, by virtue of losing, they are not in the class"). But the subclasses proposed here raise ascertainability problems.

Subclass 1 includes only those employees who, from March 16, 2020, until May 9, 2020, "did not receive all of the tips to which the employee was entitled." (Doc. 40, #303). That puts the cart before the horse. Whether an employee received the tips he is owed means membership in the subclass pivots on the employee's proving he was underpaid. *Randleman*, 646 F.3d at 350, 352 (rejecting a class definition on ascertainability grounds as membership in the class turned on whether an individual overpaid for title insurance because membership turned on the merits of each individual's claim). Put differently, if an employee were not paid all his tips as required by law, he would be in the subclass; but if his wage claim lacks merit because he was paid all he was due, he would not be in the subclass. So who is a member of Subclass 1 cannot be established until *after* the Court adjudicates the wage claims at issue. And that runs headlong into caselaw finding that such "fail-safe classes" do not meet the ascertainability requirement.

14

The same concern applies to proposed Subclass 2, which states in part that employees are not in the subclass unless they "did not receive all of the tips to which they were entitled." (Doc. 40, #304). Again, whether Fifty West employees received the proper amount of tips conflates subclass membership with success in proving that Fifty West underpaid its workers in violation of the law. *Cf. In re Build Realty, Inc.*, No. 23-301, 2023 U.S. App. LEXIS 24669, at *6 (6th Cir. Sept. 15, 2023) (noting that ascertainability may be lacking when "membership in the subclass requires an individualized review of each class member's transaction history" to know if they overpaid). That similarly raises serious ascertainability concerns.

If Morse wishes to move to certify these subclasses again, he will need to address whether his proposed class definitions permit the Court to ascertain subclass membership without adjudicating the merits of a given individual's claims. If not, ascertainability problems will likely militate against class-wide adjudication.

## 2. Numerosity

Next turn to numerosity. The Court finds numerosity is met for the class as a whole, as 150 is a sufficiently large number to make joinder impracticable. *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 570 (6th Cir. 2004). But it is concerned that the same cannot be said for Subclass 1. As Fifty West notes, it employed zero hourly employees from March 16, 2020, until April 25, 2020, and only twelve from April 25, 2020, until May 9, 2020. (Doc. 42, #339 (citing Doc. 42-1, #344)). A joinder of twelve plaintiffs does not strike the Court, at least as an initial matter, as procedurally unmanageable. And use of the class-action mechanism seems inappropriate for such

a small collection of individuals who could voluntarily join the suit. While Morse is correct that subclass numerosity is more "relaxed," (Doc. 45, #366 (quoting *NorCal Tea Party Patriots v. IRS*, No. 1:13-cv-341, 2016 WL 223680, at *6 (S.D. Ohio Jan. 19, 2016) (cleaned up))), there is a difference between "relaxed" and nonexistent. Joinder of twelve plaintiffs is practical. And unlike Subclass 2's claims, which pose a distinct legal challenge to the legality of the tip pool not in force during the early days of the pandemic, the claims of proposed Subclass 1 relate only to underpayment. Given this difference, the Court is not convinced Subclass 1's claims are "deeply intertwined" with those of Subclass 2, such that the Court should ignore how easy joinder of the twelve members of Subclass 1 would be. Morse will need to address this numerosity issue if he again seeks to certify the (rather small) proposed Subclass 1.

### 3.     Commonality and Predominance

That brings the Court to the last issue likely to rear its head if Morse seeks certification down the road: the age-old tug-of-war between individualized and class-wide inquiries in the class action space. When evaluating commonality, a court must determine whether a class's "claims [] depend upon a common contention … [that is] of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in *one stroke*." *Dukes*, 564 U.S. at 350 (emphasis added). Are there any such contentions here? Admittedly, the Court lacks any evidentiary basis to understand the class. *See supra* Part A. So, at this time, it cannot truly assess whether there are common issues that will predominate over individual issues that

16

will likely arise. But to the extent it can read the tea leaves, the Court briefly notes *some* likely candidates for individual issues that may hamper future attempts at certification.

Start with Morse's primary contention that whether class members received all the tips they were owed is capable of resolution in one stroke of the pen. (Doc. 40, #311). As previewed above, the Court is not so certain. *See supra* Part A, Section B.1. Whether an individual class member received all his tips depends on an assessment of what amount of time the tipped worker dedicated to tipped work, the total amount of money collected in tips, and the tips paid to that worker (if any). On first blush, those specific details are unique to each individual worker, which suggests that to calculate the amount of any underpayment, the Court will need to assess the claims on a class-member-by-class-member basis. This is compounded by the fact that, as Fifty West emphasizes, tipped workers wore multiple hats and switched between tipped and non-tipped work on any given day. (Doc. 42-1, #344). Any pay calculation will also need to factor in the multiple tasks a worker performed during a given shift, which raises the specter that individualized inquiries will trump class-wide concerns.

To Morse's credit, he does suggest this concern may be overstated given one could simply calculate the tips owed by reviewing Fifty West's time records to see when workers "clock[ed] in and out when they switched positions during a shift." (Doc. 45, #359). That is to say, he contends that what compensation is owed can be computed by applying a formula to Fifty West's time sheets. *Cf. Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 454–60 (2016) (sustaining a district court's use of

17

representative evidence about the average time a worker took to don and to doff clothing to calculate whether class members were properly paid when the time needed to dress caused several class members to work over 40 hours a week). But for that argument to have viability, Morse will need to present evidence showing that (1) employees knew they were to log every single time they shifted between tipped and non-tipped work and (2) those workers faithfully recorded such transitions. Because the Court can imagine such evidence existing, class-wide resolution is not foreclosed. But it is equally plausible that employees honored their obligation to record any transitions between tipped and non-tipped work in the breach. One could imagine that the dynamics of the pandemic-oriented restaurant work resulted in ad hoc rearrangements in who performed what work. For example, it would not be inconceivable for a waiter called on to address an urgent need in the kitchen to have not had the opportunity (or to have forgotten) to stop by the time clock on his way from the customers to the kitchen. If the latter were a common occurrence, Morse will have a difficult time explaining how class-wide resolution will predominate over individualized issues. That said, only discovery can tell us which storyline played out at Fifty West's locations.

Turn next to the tip pool in place from May 10, 2020, until June 5, 2021. Morse starts off on a strong footing by arguing that if this arrangement was imposed as a policy applicable to all potential class members, there would be a common question of law: whether the company-wide policy comports with Ohio's wage laws. (Doc. 45, #358, 363–65). But as Morse acknowledges, the legality of such tip pools turns on

whether participation was voluntary, *Walsh v. Dayemi Org., Inc.*, 608 F. Supp. 3d 715, 722 (S.D. Ill. 2022). (*See id.* at #362–65 (identifying reasons to believe Fifty West's tip pool was not voluntary)). And consent often raises individual issues. *See Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 467–70 (6th Cir. 2017) (finding the individualized issue of consent to be contacted by defendant prevented class certification of claims that it had violated the Junk Fax Prevention Act by sending unsolicited advertisements). On this record, it is plausible that hourly workers voluntarily agreed to pool tips, given Robert Joseph Slattery believed based on "employee feedback" that there was employee "support[] [for] sharing tips with the kitchen" staff.[6] (Doc. 42-1, #344). So Fifty West may adduce evidence showing that individual workers opted out of the tip pool or business records (such as the feedback referenced in Robert Joseph Slattery's declaration) detailing how employees agreed to participate in the tip-pool arrangement. (*See* Doc. 45, #364–65 (listing examples of such evidence that would tend to prove that the tip arrangement was voluntary)). If such evidence is produced, Morse will have to explain why class-wide resolution of the validity of the tip pool is manageable despite the risk of individualized inquiry into each worker's consent to share his tips.

On the flip side, Fifty West will have to confront Morse's evidence tending to prove that it required workers to share tips without allowing them to opt out. For example, though it is not properly before the Court, the email chain from "Bobby

---

[6] True, Robert Joseph Slattery does not state that tip sharing was voluntary (though Morse's suggestion he went to "great lengths to avoid stating directly that the tip pool was voluntary" is a stretch). (Doc. 45, #365). But given the limited evidentiary record before the Court, this declaration constitutes competent circumstantial evidence that participation was voluntary.

Slattery" filed with Morse's reply, (Doc. 44-2, #352–54), implies the tip pool was a formal arrangement imposed on all employees without their consent (though the Court is hesitant, without additional context, to adopt Morse's hyperbolic assertion that it "cannot be construed as anything other than a mandate from the owner of Fifty West that all employees … participat[e]"). (Doc. 45, #364). Again, a more complete record will reveal more about the nature of the proposed class members' claims as it relates to the tip sharing arrangement Fifty West created.[7] The Court merely notes that employee consent to the sharing of tips may pose an additional obstacle to certification.

That leaves one, final issue relating to commonality and predominance: the parties' decision to debate whether putative class members are similarly situated divorced from the claims Morse has raised. To reiterate, the Court's certification inquiry "will frequently entail overlap with the merits … because the class determination generally involves considerations that are enmeshed in the factual and

---

[7] Two points are worth reiterating. First, Morse hangs his hat on his and Hughes's declarations that staff members did not consent to the tip sharing arrangement. (Doc. 45, #363–64). But as stated several times above, such statements carry probative weight only when they are based on personal knowledge. And here, neither declarant explains how he knew whether others consented to the tip pool. *Gonzalez*, 2020 WL 13698922, at *3. So their late-filed declarations do not bar a finding that the tip pool was voluntary. *Cf. Walsh*, 608 F. Supp. 3d at 722 (noting that the existence of declarations from tipped employees stating that they believed a tip pool to be mandatory did not foreclose a finding that it was voluntary given other employees stated a contrary view in their declarations). Second, and more importantly, Morse's reply attacks Fifty West's arguments as lacking evidentiary support. (Doc. 45, #363–65). But that criticism does not work for two reasons. For starters, Fifty West did not need to proffer evidence to defeat class certification—Morse failed to carry his burden. *See supra* Part A. In addition, Fifty West's lack of evidence is attributable to Morse's moving for certification shortly after the parties' initial disclosures. (*See* Doc. 38, #295; Doc. 40; Doc. 42, #329 (noting the parties had "engaged in [only] limited written discovery and [that] no depositions have been taken or scheduled.")). It is not fair for Morse to criticize Fifty West when its lack of evidence is occasioned by Morse's decision to file this motion prematurely.

legal issues comprising the plaintiff's cause of action." *Comcast*, 569 U.S. at 33 (cleaned up). This overlap matters because it ensures the Court can competently assess whether the proposed common questions of law and fact are legally relevant given "any competently crafted class complaint literally raises common questions." *Dukes*, 564 U.S. at 349 (cleaned up).

The parties have (rightly) focused on issues about the validity of the tip pool and whether employees received all tips owed—issues seemingly relevant to Morse's claims under Ohio Revised Code § 4113.15 and the Ohio Constitution, Article II § 34a. (*See* Doc. 40, #303). But at the same time, their briefing lacks detail about the elements of each of these claims (to say nothing about their failure to discuss in any detail the unjust enrichment and § 2307.60 claims) or how the proposed common questions map onto what need to be proven at trial. (*See generally* Docs. 40, 45). Without having the briefing grounded in the relevant claims, the Court is at a loss as to how it should weigh the significance of any proposed common questions. Not all common questions are made equal for class certification purposes. *Hawes v. Macy's Inc.*, No. 1:17-cv-754, 2023 WL 8811499, at *5 (S.D. Ohio Dec. 20, 2023) ("[H]ow could a [] court determine whether a common question predominates ... uncommon questions but by reference to their legal significance?"). If Morse again moves for certification, he would do well to substantiate the importance of his proposed common questions by reference to the claims raised. That way, the Court has a metric by which it can assess whether his proposed class satisfies Rule 23's certification requirements.

## CONCLUSION

The bottom line: Morse jumped the gun and moved for certification without a sufficient evidentiary record to back up his assertions. Rather than allow for a meaningful Rule 23 analysis, his meager showing leaves the Court with several unanswered questions about the proposed class. Accordingly, it **DENIES** Morse's Motion for Class Certification (Doc. 40). That said, this denial does not prejudice a future attempt to seek certification on a more developed record. If Morse so moves, the Court reminds him that class certification is not granted as a matter of course— placing class claims in an evidentiary context is necessary (indeed essential) to ensure the Court is properly exercising its authority over absent class members' claims.

**SO ORDERED.**

March 18, 2024
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**