**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

KEVIN MORSE, et al.,

Plaintiffs,

v.

FIFTY WEST BREWING
COMPANY LLC, et al.,

Defendants.

Case No. 1:21-cv-377

JUDGE DOUGLAS R. COLE

## OPINION AND ORDER

While the Covid-19 pandemic has passed, some of the shockwaves it caused continue to reverberate. This case provides one example. It centers around how a restaurant distributed tips among its employees during the changes to typical restaurant workflow that occurred during the throes of that pandemic (and its accompanying social distancing and shutdown orders). More specifically, Plaintiff Kevin Morse accuses Defendant Fifty West Brewing Company LLC of failing to properly compensate Morse and other employees because it improperly invoked the FLSA's tip-credit exemption (and claims that the other two individual Defendants are liable for those violations as well). Defendants and Morse have cross-moved for partial summary judgment on these claims. (Docs. 83, 84). Additionally, Morse moves for class certification on the state-law claims. (Doc. 85).

For the reasons explained below, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Partial Motion for Summary Judgment (Doc. 83) and Plaintiff's Partial Motion for Summary Judgment (Doc. 84). Specifically, the

Court grants summary judgment in favor of Morse on Count I (but only as to the first collective action subgroup), Count II, and Count III. In turn, the Court grants summary judgment in favor of Defendants on Count I (but only as to the second collective action subgroup), Count IV, and Count VI. The Court, however, declines to grant summary judgment on Count V. Beyond that, the Court determines that Defendant Bobby Slattery, but not Defendant Bob Slattery, is personally liable, and otherwise finds for Plaintiff on the damages issues.

Additionally, the Court **GRANTS IN PART** Plaintiff's Motion for Class Certification (Doc. 85). The Court certifies the proposed class definition, with the revision that it only applies to Defendant's Cincinnati location. The Court further appoints Morse as class representative and appoints Brian Butler as class counsel. The Court, however, does not approve the proposed notice.

## BACKGROUND[1]

The parties largely agree on the facts underlying the dispute, but disagree as to those facts' legal implications. The timeline and specific pay periods are relevant to deciding the legal issues, though, so while they are largely undisputed, the Court still elects to provide a thorough breakdown of that timeline.

---

[1] Pursuant to the Court's Civil Standing Order (I)(F)(2)(a)–(c), Morse and Fifty West Brewing simultaneously filed a list of Proposed Undisputed Facts (Docs. 83-2, 84-1) with their motions. Each party admitted to many of the other's proposed facts. (Docs. 87-1, 89-1). Unless otherwise noted, the Court cites those documents only for admitted facts.

**A.      The Defendants.**

Fifty West Brewing Company, as the name suggests, brews and distributes beer. (Def.'s Proposed Undisputed Facts, Doc. 83-2, #1872; Pl.'s Resp. to Def. Proposed Undisputed Facts, Doc. 89-1, #2072). But it also serves food at its "quick service" restaurants, called "Burger Bars," in Ohio. (Doc. 83-2, #1872; Doc. 89-1, #2072). As relevant here, it operates one such establishment in Cincinnati. (Doc. 83-2, #1872; Doc. 89-1, #2072). There, it "employs hourly employees, including, but not limited to, bartenders, cashiers, utility employees, and kitchen employees." (Doc. 83-2, #1872; Doc. 89-1, #2072). Robert Joseph Slattery (Bobby), a Defendant here, manages the Burger Bar. (Pl.'s Proposed Undisputed Facts, Doc. 84-1, #1921; Def.'s Resp. to Pl.'s Proposed Undisputed Facts, Doc. 87-1, #2006). Bobby's father, Robert James Slattery (Bob), who is also a Defendant here, owns Fifty West, but the parties dispute his role in the day-to-day operations of the Burger Bar. (*See* Bobby Slattery Dep., Doc. 70, #1018 (denying Bob's involvement in day-to-day operations), #1057 (discussing email to Bob regarding agenda for bar staff meeting); Bob Slattery Dep., Doc. 75, #1770–73 (stating he owns the real estate and 50% of the business but does not manage its operations)).

**B.      The Early Days.**

Before the pandemic, Fifty West operated a traditional sit-down restaurant in Cincinnati. (Doc. 83-2, #1872–73; Doc. 89-1, #2072). It had planned to start a Burger Bar across the street, but due to the Covid-19 pandemic and related shutdown, it had to open that Burger Bar as a takeout-only restaurant in the parking lot. (Doc. 83-2,

#1872–73; Doc. 89-1, #2072). That change in operations also changed its need for restaurant employees. When the state-mandated shutdown first started in March 2020, Fifty West "laid off its non-exempt workforce and relied on exempt employees to manage operations and transact its limited sales." (Doc. 83-2, #1873; Doc. 89-1, #2072). But shortly thereafter, on April 12, 2020, Fifty West hired four non-exempt employees (none of whom are Plaintiffs here). (Doc. 83-2, #1873; Doc. 89-1, #2072). Then, from April 26 to May 9, Fifty West hired eight more non-exempt employees, for a total of twelve.[2] (Doc. 83-2, #1873; Doc. 89-1, #2072–73). Five of those eight additional hires are the opt-in Plaintiffs here: Kevin Morse, Benjamin Pearce, John (Jack) Hughes, Donna Hamker, and Lauren Lewis. (Doc. 83-2, #1873; Doc. 89-1, #2073). Morse admits that through May 9, 2020, "all non-exempt employees were paid over the federal and Ohio minimum wage." (Doc. 83-2, #1873; Doc. 89-1, #2073).

As most will recall, the early days of the Covid-19 pandemic were chaotic. In his deposition, Morse agreed that this first time period, April 26 through May 9, 2020, was "an all-hands-on-deck situation." (Morse Dep., Doc. 58, #510). In fact, "nobody had any actual formal titles," and "everybody was doing any of the different jobs." (*Id.*). For example, "both management and hourly personnel were both preparing food and serving customers," although Morse claims that only the kitchen employees actually cooked, rather than merely packaged, the food. (*Id.* at #508, 511; *see* Hughes Dep., Doc. 60, #644 (discussing management packing to-go orders)). Morse himself

---

[2] Morse disputes that Fifty West employed Nick Varnau, one of the original four non-exempt employees, during this period. (Doc. 89-1, #2072–73). Varnau is not a Plaintiff to this lawsuit, and whether he was an employee during this period does not alter the outcome of the case.

admits that he "work[ed] in the kitchen during that period on occasion," (Morse Admis., Doc. 58-3, #602), such as "helping out with something or giving somebody an extra hand." (Doc. 58, #524–25). But he never worked a formal shift in the kitchen. (*Id.*).

As noted, during this time, Fifty West exclusively operated as a take-out restaurant. So most of its customers placed their orders online. (Doc. 83-2, #1874; Doc. 89-1, #2073). Like many other online ordering platforms, "customers would select their food or beverage choices, pay for their choices, and leave a tip all in that initial [online] transaction." (Doc. 83-2, #1874; Doc. 89-1, #2073). After the customer placed their online order, they would receive a notification when the order was ready, and then would pick up the to-go order from a "contactless station set up under two tents placed in the parking lot." (Doc. 83-2, #1874; Doc. 89-1, #2073). At that contactless station, though, Fifty West had set up a tip jar. (Doc. 83-2, #1874; Doc. 89-1, #2073). Between tips paid through the online platform and the physical tip jar, Fifty West collected $14,516.35 in tips during that time period. (Doc. 83-2, #1874; Doc. 89-1, #2074).[3] But while it collected the tips, it did not distribute them to any employees, exempt or non-exempt. (Doc. 83-2, #1874; Doc. 89-1, #2074). Rather, Fifty

---

[3] Defendants state that Fifty West received $14,516.35 in tips. (Doc. 83-2, #1874 (citing Doc. 70, #983)). Plaintiff argues that this oversimplifies the record. (Doc. 89-1, #2074). Instead, Fifty West's sales records for March 15 to May 9, 2020, show that Fifty West received $0.00 in "Cash Gratuity," but received $14,516.35 in "Credit/Non-Cash tips." (Sales Summary, Doc. 70-5, #1213). Defendants claim that while there was a tip jar for cash, they are unsure if any customers actually deposited cash in it. (Doc. 87-1, #2006 (citing Doc. 70, #971–72, 984–86)). At the same time, Bobby Slattery stated that any cash tips collected would have been deposited in the bank. (Doc. 70, #972). Regardless, any difference between cash and credit tips does not affect whether Fifty West retained the tips in violation of the FLSA or Ohio law.

West retained the entire amount itself. (Doc. 83-2, #1874; Doc. 89-1, #2074). When asked why Fifty West did not distribute the tips, Bobby Slattery admitted that they simply "lost track of it." (Doc. 70, #991).

At this time, Fifty West did not pay its hourly employees a tip-credit wage; instead, it paid them a "training wage" of $13.00 per hour. (Doc. 84-1, #1921; Doc. 87-1, #2006). And that training wage meant they "would not be tip eligible." (Doc. 70, #989, 992).

**C.      Middle Period: May 10, 2020, to June 7, 2020.**

Starting May 10, 2020, Fifty West changed how it paid restaurant employees. Specifically, it decided to start paying "bartenders, cashiers, utility workers, food runners, and expo employees" a tip-credit wage. (Doc. 83-2, #1874–75; Doc. 89-1, #2074). And from May 10 to June 7, employees received all the tips Fifty West collected, whether through the online platform or the tip jar, which Fifty West distributed according to the number of hours a given employee in one of the above categories worked during that period. (Doc. 83-2, #1875; Doc. 89-1, #2074). There was no formal tip pool, as the FLSA uses that term, at this time. (Doc. 84-1, #1922; Doc. 87-1, #2006–07). Importantly, one category of employees—the kitchen staff—did not receive any of the tips collected during this period. (Doc. 83-2, #1875; Doc. 89-1, #2074). Instead, Fifty West paid those employees a regular wage (i.e., non-tip-credit wage) of $12.00 to $15.00 per hour. (Doc. 84-1, #1924; Doc. 87-1, #2007).

The other notable change during this period was that on May 20, the Burger Bar opened for outdoor dining. (Doc. 83-2, #1875; Doc. 89-1, #2074). The Burger Bar

6

still offered a pick-up window for to-go orders, but it also began operating an outdoor beer garden. (Doc. 83-2, #1876–77; Doc. 89-1, #2074). That beer garden contained its own pick-up window for food and non-alcoholic drinks, as well as a bar. (Doc. 83-2, #1877–79; Doc. 89-1, #2074–75). For the beer garden's in-person pick-up window, a customer would "walk up to the window, make his/her selections to the cashier, pay for the items, and leave a tip all in that initial transaction." (Doc. 83-2, #1878; Doc. 89-1, #2075). The cashier at the window frequently asked customers if they wanted to leave a tip. (Doc. 83-2, #1878; Doc. 89-1, #2075). But the parties dispute how the cashier phrased this request. Defendants claim that Bobby Slattery heard cashiers specifically include the kitchen or all staff in the request for tips, and Hannah Tuttle, an employee, admitted cashiers requested tips "for the Fifty West staff." (Doc. 66, #902; Doc. 70, #1077; Doc. 83-2, #1878). Morse, however, points out that Bobby Slattery can't remember how often this occurred or which cashiers did so. (Doc. 70, #1077–78; Doc. 89-1, #2075). And several other Plaintiff employees stated that cashiers generically asked the customer if they "wanted to leave a tip." (Doc. 58, #536; DeWitt Dep., Doc. 62, #748–49; Kuhnhein Dep., Doc. 64, #828–29). Regardless, when the order was ready, the customer would receive a text message and return to the window to pick-up the food or non-alcoholic beverages. (Doc. 83-2, #1878; Doc. 89-1, #2075).

**D.    Tip Pool Begins.**

On June 7, 2020, Fifty West started the tip pool that lies at the heart of this dispute. (Doc. 83-2, #1875; Doc. 89-1, #2074). That day, Bobby Slattery messaged all

employees announcing the tip pool. (Doc. 83-2, #1875; Doc. 89-1, #2074). Because Morse challenges the adequacy of the notice Defendants provided, and the email that Slattery sent explains the system's design, at least initially, the Court reproduces it almost in full:

> The breakdown will work as follows:
>
>> 50% of the tips will go to the bartenders.
>> 7.5% to Front Expo
>> 12.5% to Cashiers
>> 20% to Runners/Utility
>> 10% to Kitchen
>
> If you are listed as any position other than kitchen your pay rate will be set as $4.35 per hour plus tips. Kitchen wages will remain as agreed and tips will be added on to your paycheck.
>
> Should a shift be exceptionally slow it is required that you earn $8.70 per hour minimum and we will adjust this should this happen. In all of our modeling there has not been a night where that has been the case.
>
> Regarding cash tips, [b]ecause we are splitting the cash tips across upwards of 30–50 employees each night[,] the cash tips will no longer be distributed separately and will be included in the tips on your paycheck. Cash tips unlike credit card tips (which are paid out at 97% because of processing fees) will be paid out at 100% as there are no fees involved.
>
> …
>
> If you are switching positions mid shift please be sure to clock in and clock out as your pay rate will vary depending on position.
>
> If you have any questions about the system do not hesitate to reach out. I'm happy to sit down and walk anyone interested through it. The goal is to be very transparent so everyone is comfortable and understanding of the system.
>
> Please keep in mind we have spent a lot of time making sure we got this right but we are human and not always perfect. Should we need to make adjustments in the future because the business flow changes we will be sure to be very transparent and collect feedback from everyone involved.

(Doc. 70-11, #1270–72).

One of the key takeaways from that message is that which position the employee clocked in for when they started their shift would change their pay because it would change what tip allocation they received. (Doc. 83-2, #1876; Doc. 89-1, #2074). The parties generally agree that employees were regularly asked to assist in other positions that might need help. (Doc. 83-2, #1879; Doc. 89-1, #2076). They differ, though, on the specifics about how changes in position actually played out in practice. Defendants claim that "employees were asked to clock-in and clock-out if they helped in different positions, but they did not always do so." (Doc. 83-2, #1880 (citing Doc. 70, #1116)). Morse, on the other hand, claims that employees were not told to do so if they were only "briefly help[ing] in another position," but rather were instructed to do so only if they completely switched positions. (Doc. 89-1, #2077). The difference in the two accounts seems to be how long an employee was expected to work in a different area before clocking-out of the one position and clocking-in to the new one. The employees deposed, both managerial and not, seem to agree that employees generally did not clock out of their old position and clock back into their new position. (Doc. 58, #527; Doc. 62, #761; Doc. 64, #831; Doc. 66, #897; Hanes Dep., Doc. 71, #1503). In terms of duration in the other position, one employee estimated he spent about thirty minutes up to an hour in his non-standard role per week. (Doc. 62, #761).

The parties dispute whether the tip pool arrangement was voluntary. For now, the Court notes that the employees did not vote or otherwise signal assent to the arrangement before its implementation. (Doc. 84-1, #1924 (Bobby Slattery "could not identify any hourly employees involved in creating the tip pool"), 1928 ("The staff did

not vote on whether to implement the tip pool"); Doc. 87-1, #2008–09). And there is debate whether Defendants knew the employees were disgruntled with the tip breakdown. (Doc. 70, #1042, 1056–59; Doc. 70-12, #1273–75 (bar staff meeting agenda that includes "Tip share breakdown" as an issue); Roys Dep., Doc. 73, #1689–91 (bar manager recalled "dissatisfaction" with the tip pool amongst bartenders); *but see* Doc. 71, #1520 (bar manager does not recall bartenders "voicing concerns" to him)).

In terms of how the tip pool operated logistically, cash tips were generally collected at the end of the day and combined with credit card tips received. (Doc. 84-1, #1925; Doc. 87-1, #2008).[4] From there, Joe Hanes, an employee, would input those tips, as well as all employees' hours, into an Excel spreadsheet, which generated a total amount. (Doc. 84-1, #1925; Doc. 87-1, #2008). That spreadsheet also "contained formulas that automatically calculated the tip share percentage and generated the corresponding payout amount for each position." (Doc. 84-1, #1925; Doc. 87-1, #2008). Although the spreadsheet originally reflected the percentages set forth in Bobby Slattery's emailed announcement, Slattery frequently modified the percentages. (Doc. 70, #1081–85; Doc. 70-14 (spreadsheet of employee pay and position percentages); Doc. 84-1, #1926 ("This calculation was adjusted daily."); Doc. 87-1, #2009). For example, the record reflects instances where cashiers and runners were both paid 16.25% of tips collected rather than the 12.5% and 20%, respectively, that the original email stated. (Doc. 70-11, #1270; Doc. 70-14, #1287–92). And Bobby

---

[4] Defendants deny that they collected cash tips, (Doc. 87-1, #2008), but their cited materials agree that cash tips were generally collected at the end of the day, (Doc. 70, #972; Doc. 71, #1508–09).

Slattery did not inform the employees of these modifications, beyond informing them that the tip percentages changed depending on the position they worked. (Doc. 70, #1084–85).

This tip pool arrangement persisted for almost a year—through June 5, 2021. (Doc. 84-1, #1924; Doc. 87-1, #2007). That was the day after Morse filed this action. (*See* Doc. 1). As a result of the filing, Fifty West altered the tip pool and removed the kitchen staff from participating in it. (Doc. 84-1, #1932; Doc. 87-1, #2011). It also issued a written notice and required employees to sign that they understood "the tip pool procedures, the tip credit, and that there would be no opportunity to opt-out of the tip pool." (Doc. 84-1, #1932; Doc. 87-1, #2011). Throughout the year that the tip pool was in effect, Fifty West hired approximately 150 employees "as bartenders, cashiers, and expos." (Stipulation, Doc. 39-1, #299).

**E.    Lawsuit.**

Unhappy with the tip pool arrangement, Morse filed this six-count lawsuit, asserting: (1) an unlawful distribution of tips in violation of the FLSA; (2) an illegal tip pool and consequent failure to pay minimum wages in violation of the FLSA; (3) a failure to pay minimum wages under Ohio law; (4) untimely payment of wages under Ohio law; (5) damages under Ohio law; and (6) unjust enrichment. (*Id.* at #10–14). And he did not bring this action only for himself—rather he brought the first two counts as FLSA collective action claims and the remaining four as class action claims. (*Id.* at #8–10). Fourteen other employees have since joined as Opt-In Plaintiffs for the

11

FLSA collective action. (Doc. 16). And the Court conditionally certified two collective action subgroups:[5]

> Sub[group] 1: All hourly employees who have been employed by Defendants as a bartender, cashier or utility at any time between March 16, 2020, and May 9, 2020, during which time Defendants paid the employee the minimum wage and during which time the employee did not receive all of the tips to which the employee was entitled.

> Sub[group] 2: All tip-credited employees (i.e., any employee who received a tip-credit wage, or in other words an hourly rate below the federal minimum wage, and as to whom the employer was relying on a tip-credit (which is lawful) to make up the difference between the hourly rate and the federal minimum wage) who have been employed by Defendants at any time between May 10, 2020, and June 5, 2021, who participated in a tip pool with employees who do not customarily and regularly receive tips and/or who did not receive all of the tips to which they were entitled.

(Doc. 29, #196–97). Essentially, the first subgroup were employees who worked from March 16, 2020, through May 9, 2020, before Fifty West created the tip pool. (*Id.*). Conversely, the second subgroup consists of those who were employed from May 10, 2020, through June 5, 2021, when the allegedly infringing tip pool was in effect. (*Id.*). After distributing notice of the collective action, thirty-two more employees joined the suit, (Docs. 30, 33, 34), for a total of forty-six Opt-In Plaintiffs.

On August 16, 2023, Morse also moved to certify a class for his state-law claims, (Doc. 40), but the Court denied that motion, primarily due to a lack of evidence, (Doc. 47). Several months later, Defendants moved to dismiss a number of Opt-In Plaintiffs due to a failure to prosecute. (Doc. 52). The Court granted that

---

[5] Because there are both FLSA collective action subclasses and Rule 23 class action subclasses at play, the Court will refer to the FLSA ones as subgroups to avoid confusion.

motion and dismissed fourteen Opt-In Plaintiffs, leaving thirty-two. (Doc. 56). From there, the parties proceeded with discovery.

That brings the Court to the present motions. Both sides have now moved for partial summary judgment. (Docs. 83, 84). Defendants, however, move for summary judgment on almost all counts, with the sole exception being part of Count I. (Doc. 83). Morse, meanwhile, does not move for summary judgment on Counts V or VI. (Doc. 84). Additionally, Morse moves again to certify a class. (Doc. 85).

Both sides have responded, (Docs. 87, 88, 89), and replied, (Docs. 90, 91, 92). So the matter is ripe for the Court's review.

## LEGAL STANDARD

### A. Summary Judgment.

In evaluating the parties' cross-motions for summary judgment, the Court keeps in mind that "[t]he 'party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600, at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). But if the moving party does so, the nonmoving party cannot defeat a motion for summary judgment merely by pointing to just *any* factual dispute. As the Sixth Circuit has explained, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material

13

fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (cleaned up) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

In sum, the nonmoving party must present some "sufficient disagreement" that would require submission to a jury. *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (citations omitted). In making that determination, though, the Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation omitted); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

When both parties move for summary judgment, that does not change the analysis the Court applies to either party's motion. Rather, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Black v. Pension Benefit Guar. Corp.*, 973 F.3d 576, 581 (6th Cir. 2020) (quoting *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019) (quotation marks omitted)), *superseded on other grounds*, 983 F.3d 858 (6th Cir. 2020). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts." *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016) (quoting *Taft Broad. Co. v. United States*, 929 F.3d 240, 248 (6th Cir. 1991)).

14

**B.     Class Certification.**

A class action represents "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). To justify departing from the typical named-parties-only rule, a putative class representative must make certain showings. First, under Federal Rule of Civil Procedure 23(a), the named plaintiff must show that: (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequacy). These requirements limit the potential abuse of the class action mechanism by ensuring that the class claims are "fairly encompassed by the named plaintiff's claims." *Id.* at 349 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982)).

Beyond satisfying the four factors Rule 23(a) identifies, though, a putative class also must meet one provision of Rule 23(b). Here, Morse relies on Rule 23(b)(3). (Doc. 85, #1957). Certification under this provision requires consideration of two issues–predominance and superiority.

As to the former, to certify under this subsection, the court must "find[] that the questions of law or fact common to class members predominate over any question affecting only individual members." Fed. R. Civ. P. 23(b)(3). This "predominance" inquiry is like, though "more stringent" than, Rule 23(a)(2)'s "commonality"

15

requirement, with predominance said to "subsume[]" or "supersede[]" commonality. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609 (1997). In other words, "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)['s commonality requirement]." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (citing *Amchem*, 521 U.S. at 623–24).

Superiority, on the other hand, requires the court to determine whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This "superiority" requirement aims to "achieve economies of time, effort, and expense, and promote … uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615 (quoting Fed. R. Civ. P. 23 Advisory Committee's note to 1966 amendment).

Rule 23(b)(3) lists four non-exhaustive factors "pertinent" to the "predominance" and "superiority" analyses. These include: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions," (2) "the extent or nature of any litigation concerning the controversy already begun by or against class members," (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum," and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)–(D).

Whether a court may appropriately certify a class is separate from whether the putative class, as defined, will succeed on the merits of the claims. That said, "it may be necessary for the court to probe behind the pleadings before coming to rest on the

16

certification question." *Comcast*, 569 U.S. at 33 (internal quotation marks omitted) (quoting *Dukes*, 564 U.S. at 350). Indeed, the Supreme Court has directed courts to undertake a "rigorous analysis" before certifying a class—an analysis that "frequently entail[s] 'overlap with the merits of the plaintiff's underlying claim.'" *Id.* at 33–34 (quoting *Dukes*, 564 U.S. at 351).

At bottom, a "district court has broad discretion to decide whether to certify a class. [The Sixth Circuit] has described its appellate review of a class certification decision as 'narrow,' and as 'very limited.'" *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 850 (6th Cir. 2013) (citations omitted).

## LAW AND ANALYSIS

The Court starts with the parties' cross-motions for summary judgment, (Docs. 83, 84), before evaluating Morse's request for class certification, (Doc. 85), as such certification will only apply to those counts that survive summary judgment.

### A. Summary Judgment.

Morse asserts six claims: (1) an unlawful distribution of tips in violation of the FLSA; (2) an illegal tip pool and resulting failure to pay minimum wages under the FLSA; (3) a failure to pay minimum wages under Ohio law; (4) untimely payment of wages under Ohio law; (5) damages under Ohio law; and (6) unjust enrichment. (Doc. 1, #10–14). Defendants move for partial summary judgment on almost all counts, except that for Count I, they only request summary judgment for a sub-set of employees. (*See generally* Doc. 83). And Morse moves for partial summary judgment on only the first four counts. (*See generally* Doc. 84). Between the two motions,

17

though, the parties cover all claims. So while the parties each take the counts out of order, the Court will evaluate all of them and in the order the Complaint lists them. Ultimately, the Court **GRANTS IN PART** and **DENIES IN PART** both Plaintiff's and Defendants' Motions (Docs. 83, 84). The Court grants summary judgment in favor of Morse for Count 1 as applied to the first subgroup, Count II, and Count III. Conversely, the Court grants summary judgment in favor of Defendants on Count I for the second subgroup, on Count IV, and on Count VI. The Court, however, declines to grant summary judgment on Count V. Beyond that, the Court determines that Bobby, but not Bob, Slattery is personally liable, and otherwise finds for Morse on the damages issues.

### 1.    Count I - Unlawful Distribution of Tips.

To start, Morse alleges that Defendants violated the FLSA by collecting tips from customers, withholding them from hourly employees, and instead unlawfully distributing those tips to supervisors and managers. (Doc. 1, #10). Moreover, Morse's Complaint alleges that Defendants did so for both collective action subgroups, covering workers employed from March 16, 2020, through June 5, 2021, regardless of the tip pool arrangement. (*Id.*; Doc. 29, #196–97).

Defendants argue that "there is no record evidence that Defendants kept any tips after May 9, 2020." (Doc. 83-1, #1869). All tips collected after that date were distributed to hourly employees, so they cannot have unlawfully withheld them. (*Id.*). Accordingly, it moves for summary judgment on the claim for the time period after May 9, which effectively means it is seeking summary judgment as to the second

subgroup. (*Id.*). Defendants do not, however, request summary judgment on this claim for April 25 to May 9, 2020, and acknowledge there is a question of fact about who received the $14,516.35 in tips during that time. (*Id.* at #1869 n.4).

Relatedly, Morse, in his summary judgment motion, only discusses Fifty West's violations from April 25 to May 9, 2020. (Doc. 84, #1911–12). And in his Response, he concedes that starting May 10, 2020, Fifty West began distributing tips, so employees after that date "are not entitled to recovery." (Doc. 89, #2069).

Because the parties agree that Count I does not apply to the second subgroup (those employed after May 9, 2020), the Court grants summary judgment in favor of Defendants as to that subgroup.[6] But as explained below, the Court finds summary judgment in favor of Morse is appropriate for the first subgroup.

Under the FLSA, "[a]n employer may not keep tips received by its employees for any purposes, including allowing managers or supervisors to keep any portion of employees' tips, regardless of whether or not the employer takes a tip credit." 29 U.S.C. § 203(m)(2)(B); *see also* 29 C.F.R. §§ 531.52, .54 (prohibiting employers from retaining tips for any reason). Defendants admit that Fifty West retained $14,516.35 in tips from April 25 through May 9, 2020. (Doc. 83-2, #1874 (citing Doc. 70, #983)). While they claim they "lost track of it" due to the chaos of the pandemic, (Doc. 70,

---

[6] Specifically, the Court dismisses Count I for Plaintiffs Nicholas Gillian, Courtney Roth, James Conner, Carly Liber, Emily Spring, Ava Kuhnhein, Lauren Loncki, Hannah Tuttle, Bradley Kopp, Kendall Holmes, Henry Martis, Mack Ellis, Kyle Davis, Timothy Combes, Jessica King, Anna Backer, Raymond Barrish, Melissa Dewitt, Elizabeth Helfin, Kelsey Iker, Carolina Mayfield, Asher Hirsch, Elijah Kirk, Nathan Berger, and Adam Luneak. (*See* Doc. 83-1, #1869–70).

#991), that does not negate liability. Nor does it help Defendants that, during this period, management performed many of the tasks normally undertaken by hourly employees, such as "preparing food and serving customers." (Doc. 83-1, #1869 n.4). Even if it were legal to distribute tips to management in that setting, there is no evidence to suggest any tips were paid to them either. Rather, Fifty West, the entity, retained all $14,516.35. (Doc. 83-2, #1874). This violates the FLSA's plain language. Thus, the Court grants summary judgment in favor of Plaintiff for the time period of April 25 to May 9, 2020 (i.e. for the first subgroup).[7]

##### 2. Count II - Illegal Tip Pool and Failure to Pay Minimum Wages Under the FLSA.

For Count II, Morse claims that Defendants failed to pay him and non-kitchen staff employees the full minimum wage as the FLSA requires because Defendants improperly invoked the tip-credit exception. (Doc. 1, #11). Morse alleges that this Count applies solely to the second subgroup because it concerns Defendants' invocation of the tip credit. (*Id.*). While Defendants imposed the tip credit starting May 10, 2020, they did not implement the formal tip pool arrangement until June 7, 2020. (Doc. 83-2, #1874–75; Doc. 89-1, #2074). Morse alleges that this tip pool was invalid because it (1) included employees who do not customarily and regularly receive tips, (2) Defendants did not furnish the proper notice when it implemented the tip credit, and (3) the tip pool was not voluntary. (Doc. 1, #11; Doc. 84, #1894–

---

[7] The damages implication of that liability determination is a matter that the Court will address with the parties after they have had an opportunity to review this Opinion.

1910). The Court starts with an explanation of the FLSA's minimum wage and tipping provisions before analyzing Plaintiff's claims here.

### a. The FLSA and Tipping.

As a general matter, the FLSA requires covered employers to pay non-exempt employees a minimum wage of $7.25 an hour.[8] 29 U.S.C. § 206(a)(1)(C). The FLSA allows employers to treat tipped employees differently though. As to such employees, an employer may pay them below $7.25 per hour as long as, when combined with tips, their hourly wage meets or exceeds $7.25. *Id.* § 203(m)(2)(A). When an employer chooses this option, it takes a "tip credit." *See, e.g.*, 29 C.F.R. § 531.54. And the statute defines a tipped employee as "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips." 29 U.S.C. § 203(t).

Importantly, a tipped employee is entitled to retain all tips the employee receives. *Id.* § 203(m)(2)(A). The FLSA, however, provides an exception whereby an employer can "pool[] tips among employees who customarily and regularly receive tips." *Id.* So an employer can opt to pay its employees a tip-credit wage, and it can satisfy the tip component of that wage by aggregating tips and distributing them amongst all tipped employees. If an employer elects to take the tip credit this way,

> (1) The employer may require an employee for whom the employer takes a tip credit to contribute tips to a tip pool only if it is limited to employees who customarily and regularly receive tips; and

> (2) The employer must notify its employees of any required tip pool contribution amount, may only take a tip credit for the amount of tips

---

[8] There is no dispute over whether Fifty West is a covered employer or whether Morse and other employees are exempt.

each employee ultimately receives, and may not retain any of the employees' tips for any other purpose.

(3) An employer may not receive tips from such a tip pool and may not allow managers and supervisors to receive tips from the tip pool.

29 C.F.R. § 531.54(c). As long as the employer redistributes the tips among "other employees who are eligible to receive tips," the employer is not considered as keeping the tips themselves. *Id.* § 531.54(b)(1).

In contrast, "[a]n employer that pays its tipped employees the full minimum wage and does not take a tip credit may impose a tip pooling arrangement that includes dishwashers, cooks, or other employees in the establishment who are not employed in an occupation in which employees customarily and regularly receive tips." *Id.* § 531.54(d). In other words, if an employer wishes to implement a broad tip pool encompassing a wide range of employees, then it cannot take advantage of the reduced tip-credit wage and instead must pay even tipped employees the normal minimum hourly wage.

As for the burden of proof, the Sixth Circuit has routinely held that "an employer who claims to be exempt from the requirements of the Fair Labor Standards Act has the burden of proving it qualifies under the terms of a specific exemption." *Chao v. Double JJ Resort Ranch*, 375 F.3d 393, 396 (6th Cir. 2004) (citing *Homemakers Home & Health Care Servs., Inc. v. Carden*, 538 F.2d 98, 101 (6th Cir. 1976)); *see also Roshon v. Eagle Rsch. Grp., Inc.*, 314 F. Supp. 3d 852, 859 (S.D. Ohio 2018) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97 (1974)) ("FLSA overtime exemptions are 'affirmative defense[s] on which the employer has the burden of proof.'"). Furthermore, "exemptions from the Act are to be narrowly

22

construed against the party asserting them and their application limited to those establishments plainly and unmistakably within their terms and spirit." *Chao*, 375 F.3d at 396 (quoting *Homemakers*, 538 F.2d at 101). "To obtain summary judgment, a movant who bears the burden of proof on an issue asserted as an affirmative defense must establish all of the essential elements of the defense to warrant judgment in his favor." *Roshon*, 314 F. Supp. 3d at 859 (citations omitted).

### b.   Fifty West's Tip Pool Structure.

With that background in mind, turn to Plaintiff's allegations and related summary judgment arguments. Broadly speaking, Morse claims that Defendants could not pay employees the lower hourly tip-credit wage because they improperly included the kitchen staff in the tip pool. (Doc. 1, #7, 11). According to Morse, because kitchen staff do not "customarily and regularly receive tips," including them in the tip pool meant that Fifty West could not pay a tip-credit wage to any of its employees. (*Id.*; Doc. 84, #1898–1910). Rather, the FLSA required Fifty West to pay all of its non-exempt employees the full minimum wage. Beyond the ineligible-employees issue, Morse also argues that Defendants did not provide sufficient notice of the tip credit and pooling arrangement, and that the manner of allocating the tip pool was not voluntary. (*Id.* at #1894–98, 1908–10).

Defendants also move for summary judgment on this count and maintain that the kitchen staff qualify as employees who customarily and regularly receive tips. (Doc. 83-1, #1857–63). While kitchen staff have not historically received tips, Defendants argue that Covid-19 changed tipping culture and that customers

intended kitchen staff to receive tips, too. (*Id.* at #1859–63). Because of that change, Defendants argue the tip pool was properly constituted, and so they could allow kitchen staff to participate in the tip pool and still take advantage of the tip credit. (*Id.*). On voluntariness, they don't say much, but their other briefing reveals that they believe the arrangement was voluntary. (*See, e.g.,* Doc. 88, #2031–32). Finally, as for the notice issue, Defendants argue that the Court must reject Plaintiff's argument because they raise it for the first time in summary judgment. (Doc. 87, #1989–91). Even if the Court were to consider it, though, Defendants maintain they provided employees the proper notice. (*Id.* at #1991–93).

The Court first focuses on the validity of the tip pool and whether the kitchen staff were employees who "customarily and regularly received tips" before briefly addressing voluntariness and notice.

The parties agree on the relevant facts here. Beginning June 7, 2020, Fifty West implemented a tip pool wherein it distributed tips among its bartenders, front expo, cashiers, runners and utility workers, as well as kitchen staff. (Doc. 83-2, #1875; Doc. 89-1, #2074). All of the hourly employees, except the kitchen staff, received a tip-credit wage of $4.35 per hour. (Doc. 83-2, #1875; Doc. 89-1, #2074). The kitchen staff, meanwhile, earned $12.00 to $15.00 per hour, as well as their share of the tip pool. (Doc. 84-1, #1924; Doc. 87-1, #2007).

So the question is whether, as a matter of law, the kitchen staff were "employees who customarily and regularly receive tips," such that including them did not invalidate the tip pool. 29 C.F.R. § 531.54(c). The Court determines that the

24

kitchen staff were not tipped employees in this sense, so the tip pool was invalid. Thus, Defendants wrongfully took the tip credit.

Start with the text of the regulations. While the regulations do not necessarily define "employees who customarily and regularly receive tips," one provision, 29 C.F.R. § 531.54(d), clearly states that "[a]n employer that pays its tipped employees the full minimum wage and does not take a tip credit may impose a tip pooling arrangement that includes *dishwashers, cooks*, or other employees in the establishment who are not employed in an occupation in which employees customarily and regularly receive tips." (Emphasis added). So the regulation specifically cites dishwashers and cooks, i.e. kitchen staff, as two examples of employees who do not customarily and regularly receive tips. In fact, this regulation specifically provides that an employer *cannot* take the tip credit if it wants to include dishwashers and cooks in the tip pool.

If that were not enough, the Department of Labor (DOL) guidelines also state that "[c]hefs or cooks, … [d]ishwashers, … [s]alad preparers; and [p]rep cooks" "are not eligible to participate in a mandatory traditional tip pool." U.S. Dep't of Labor, Field Operations Handbook § 30d08(c)(4) (2023) (emphasis removed).[9] While the Court is not necessarily bound by the DOL's guidance, its "materials can help give meaning to ambiguous statutory and regulatory phrases like 'customarily and regularly receive tips.'" *Montano v. Montrose Rest. Assocs., Inc.*, 800 F.3d 186, 190 (5th Cir. 2015).

---

[9] https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/FOH_Ch30.pdf

Caselaw suggests the same. The primary Sixth Circuit case addressing this issue, on which both parties rely, is *Kilgore v. Outback Steakhouse of Florida, Inc.*, 160 F.3d 294 (6th Cir. 1998). In *Kilgore*, the Sixth Circuit considered whether hosts at a restaurant customarily and regularly receive tips, such that the restaurant can pay them a tip-credit wage and include them in the tip-pooling arrangement.[10] *Id.* at 301. The appeals court held that hosts were properly considered tipped employees and part of the pooling arrangement because, even though they "are not the primary customer contact," they "have more than de minimis interaction with the customers." *Id.* And the court specifically differentiated hosts from "restaurant employees like dishwashers, cooks, or off-hour employees like an overnight janitor who do not directly relate with customers at all." *Id.*

Likewise, the Sixth Circuit has concluded that salad makers are not customarily tipped employees because they "abstain[] from any direct intercourse with diners, work[] entirely outside the view of restaurant patrons, and solely perform[] duties traditionally classified as food preparation or kitchen support work." *Myers v. Copper Cellar Corp.*, 192 F.3d 546, 550 (6th Cir. 1999). Because the salad makers were not properly tipped employees, the restaurant's tip pooling scheme was invalid, and it was required to pay its employees the full minimum wage. *Id.* at 551.

The Fifth Circuit has more recently established some guidelines for when an employee is customarily and regularly receiving tips. *Montano*, 800 F.3d at 193. It

---

[10] Unlike *Kilgore*, the parties here are not debating whether kitchen staff could have been paid a tip-credit wage. The only issue is whether they could participate in the tip-pooling arrangement.

determined that a court "must consider the extent of an employee's customer interaction" because "the goal of the inquiry [is] determining the customer's intent." *Id.* Accordingly, another factor to weigh is the degree to which the employee "engag[es] in customer service functions." *Id.* Essentially, "[t]he central difference between employees who are traditionally tipped and those who are not is that the former work primarily in the front of the house where they are seen by and interact with customers, while the latter work primarily or exclusively in the back of the house." *Id.* With that understanding, the court in *Montano* found summary judgment inappropriate because there was a genuine dispute as to whether the coffeeman, the position at issue, sufficiently interacted with customers leaving tips. *Id.* at 194.

Based on the regulations, DOL guidance, and caselaw, the Court finds that the kitchen staff do not customarily and regularly receive tips. In its employee handbook, Fifty West describes its kitchen staff as "back-of-house" employees, whose primary responsibilities include preparing dishes and cleaning. (Doc. 70-26, #1463). These staff do not interact with customers at any step. (*See id.*). Contrast that with the cashiers, bartenders, and runners that did interface with customers, if only for a brief period. Accordingly, the kitchen staff here are more similar to the salad preparers in *Myers* than the hosts in *Kilgore*. Fifty West improperly included them in the redistribution of tips, which invalidates the tip pool and its ability to take the tip credit. Therefore, Fifty West violated the FLSA.

Defendants do not meaningfully dispute the mountain of precedent suggesting that outcome. Instead, they argue that customs have changed, rendering the

27

precedent irrelevant. (Doc. 83-1, #1858–63). Specifically, they offer a creative argument that the distinction between front- and back-of-house workers makes less sense given changes in tipping culture that started during the Covid-19 pandemic. (*Id.*). It may be true that these regulations and cases were decided when most tips were left by customers after service, such as tipping a waiter after a sit-down meal. (*See id.* at #1859). And the Court acknowledges it is increasingly common for customers to leave a tip at the same time they order a meal, with only minimal interaction with a cashier, or even to leave a tip before any interaction with any employee, such as when customers order online or through an app. (*Id.*). But those arguments strike the Court as better directed at the DOL or Congress—who authored the statute and accompanying regulations.

Urging a different result, Defendants seize on *Montano*'s declaration that the main factor in deciding whether an employee customarily receives tips is customer intent, and they further point to the concurrence in *Montano* that warned that customer interaction may not always be a helpful guide. (Doc. 83-1, #1858 (citing *Montano*, 800 F.3d at 195 (Dennis, J., concurring))). A concurrence, however, is not binding on lower courts in the best of circumstances, and *Montano* is an out-of-circuit opinion to boot. Moreover, even taking the *Montano* concurrence at face value, it suggests that the Court should focus its inquiry on the customers' intent when leaving the tip. *Montano*, 800 F.3d at 195 (Dennis, J., concurring). But what evidence do Defendants offer to prove its customers' intent here? They offer: (1) a single customer's affidavit stating they expect their tip to be split among all employees,

28

including kitchen staff, (Lewellen Decl., Doc. 68); (2) several opt-in Plaintiffs' testimony that when they leave a tip at a coffeeshop, they want that tip to go to the person who makes the coffee, (Doc. 64, #833; Doc. 66, #900); (3) several articles purporting to show the change in tipping culture, (Doc. 83-1, #1859); and (4) Bobby Slattery's testimony that he heard, on occasion, cashiers ask if customers wanted to leave a tip "for the staff" or "for the kitchen." (Doc. 70, #1077). When questioned, though, Bobby could not remember which cashiers asked it this way, (*id.*), and all the cashiers deposed stated they asked generally if customers wanted to leave a tip, (Doc. 58, #536; Doc. 62, #748–49; Doc. 64, #829; Doc. 66, #902–03). These few pieces do not suffice to overcome current regulations, DOL guidance, and Sixth Circuit caselaw all suggesting that kitchen staff are not customarily and regularly tipped employees.

On a related tack, Defendants warn that depriving kitchen staff of a portion of the tips "subvert[s] customer intent." (Doc. 83-1, #1863). But that assumes that Fifty West did not have any other method by which it could distribute tips to the kitchen. Looking at the regulations, though, it could have paid all of its employees the full minimum wage, and then created a tip pool that included all employees. 29 C.F.R. § 531.54(d). Defendants made the choice to take advantage of the tip-credit wage instead. That's fine, but it can't have its tip-credit-wage cake and eat it, too.

Furthermore, the parties discuss whether employees worked other positions during their shifts in a way that alters whether they are properly tipped employees. (Doc. 84, #1903–05). But the Court agrees with Morse that this argument does not actually help Defendants. If a tipped employee worked in another tipped employee's

29

role for part of their shift, this would not change whether they were properly considered a tipped employee. It may change what percentage of the tips they received, but it would not invalidate the tip pool. On the other hand, if a tipped employee worked a non-tipped position, Fifty West could not consider that employee a tipped employee during that time. In fact, 29 C.F.R. § 531.56(e) specifies that if an employee works a tipped and non-tipped position, then "no tip credit can be taken for his hours of employment" in the non-tipped role. So here, if employees worked in such dual occupations, Fifty West was not entitled to pay them a tip-credit wage for their work in the kitchen. Rather than validating the tip pool, this argument shows that Fifty West is even less entitled to the tip credit.[11] The Court will revisit this argument when it discusses class certification, though.

One last issue: voluntariness. As a general matter, an employer may only require employees to participate in a tip pool if that pool "is limited to employees who customarily and regularly receive tips." 29 C.F.R. § 531.54(c)(1). But the pool can include other types of employees if the tipped employees voluntarily agree to it: "a tipped employee may voluntarily choose to share tips with an otherwise ineligible employee, so long as that tip-sharing is done without coercion by the employer." *Walsh v. Dayemi Org., Inc.*, 608 F. Supp. 3d 715, 722 (S.D. Ill. 2022) (citing Dep't of

---

[11] That said, the regulation also states that the dual-occupation issue "is distinguishable from that of a waitress who spends part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses." 29 U.S.C. § 531.56(e). To the extent that this is similar to Fifty West's employees changing positions temporarily and so Fifty West could pay those employees a tip credit for the entire shift, it does not change the fact that the kitchen staff were improperly included in the tip pool, and so the tip credit does not apply.

Labor Field Operations Handbook § 30d04(g) (2016)). In other words, even if the kitchen staff are not eligible to participate in the tip pool as a general matter, if those who are eligible voluntarily elect to include kitchen staff in the tip pool, that is fine.

The Fifth Circuit has held that "voluntary" is properly defined as "free from any coercion whatever and outside of any formalized arrangement or as a condition of employment." *Rousell v. Brinker Int'l, Inc.*, 441 F. App'x 222, 230 (5th Cir. 2011) (citing Dep't of Labor Field Operations Handbook § 30d04(c) (1988)).[12] And, recall, Defendants have the burden to demonstrate they are entitled to the tip-credit exception, so they have the burden to show this was a voluntary arrangement. *Chao*, 375 F.3d at 396.

Defendants do not address voluntariness in their summary judgment briefing, instead only raising it as a bar to class certification. (Doc. 88, #2031–32). So to the extent that voluntariness is necessary to still claim the tip credit while including kitchen staff, Defendants have not properly met their burden. But because Defendants raise it generally, the Court will briefly address the issue.

The Court finds that this tip pool involving ineligible employees was not voluntary because it was part of a "formalized arrangement," *Rousell*, 441 F. App'x at 230, and the tip pool had not been "mutually agreed upon" between the employees, 29 C.F.R. § 531.54(a). Fifty West implemented the tip pool simply by sending a

---

[12] The current DOL Field Operations Handbook states that tipped employees may "voluntarily share tips with other non-managerial employees, so long as such sharing is free from coercion, outside of any formalized arrangement, and is not a condition of employment." https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/FOH_Ch30.pdf.

message stating the breakdown to all employees. (Doc. 83-2, #1875; Doc. 89-1, #2074). More to the point, Defendants admit that employees did not vote or otherwise signal assent to the arrangement before its implementation. (Doc. 84-1, #1924 (Defendants unable to identify hourly employees who helped design tip pool), 1928 ("The staff did not vote on whether to implement the tip pool."); Doc. 87-1, #2008–09). Perhaps such formal assent is not strictly required. But the Court also agrees with Morse that even if employees agreed with the original percentages, they could not have continued to mutually agree or voluntarily participate in a tip pool that changed each pay period without their knowledge. (Doc. 84, #1909; *see* Doc. 70, #1130–32 (Bobby Slattery admitting that he "alter[s] the percentages a little day-in and day-out")). To be clear, the Court does not challenge Fifty West's ability to unilaterally impose a tip pool generally while continuing to pay the reduced tip-credit hourly wages. But it cannot require employees, as part of a formalized arrangement, to share tips with ineligible employees, without their assent. And Fifty West has not met its burden to prove that there was such assent.

There is one remaining issue. Morse raises Count II for the second subgroup, which includes those who were employed starting May 10, 2020. (Doc. 29, #197). Defendants, however, did not implement the tip pool until June 7, 2020. (Doc. 83-2, #1875; Doc. 89-1, #2074). From May 10 until June 6, Defendants indeed paid front-of-house employees a tip-credit wage, but "[a]ny tips collected during that period were paid out to employees receiving the tip-credit wage based on the number of hours they had worked." (Doc. 83-2, #1875; Doc. 89-1, #2074). There was no formal tip pool;

32

instead, "Defendants informally collected tips and distributed them." (Doc. 84-1, #1922; Doc. 87-1, #2006–07).[13] And Morse agrees that kitchen staff did not receive any of these tips. (Doc. 83-2, #1875; Doc. 89-1, #2074).

Based on that final admission, the Court cannot find that Defendants operated an invalid tip pool from May 10 to June 6, 2020. Defendants potentially could not have provided the proper notice for that first time period. But Morse's arguments regarding the inadequacy of the notice Defendants provided to employees only address the time period from June 7, 2020, and on. (Doc. 84, #1896 ("Here, the record reflects that Fifty West failed to satisfy the tip-credit notice requirements … Fifty West sent out one mass announcement on June 7."). And he only discusses the adequacy of the notice provided on June 7, not any notice provided on May 10 or thereabouts. So Morse has not offered any record evidence for that time period for the Court to evaluate. True, in the subsequent section addressing the tip pool's validity, Morse states "[a]t all times therein." (*Id.* at #1898). But as already mentioned, the kitchen staff did not receive tips until the tip pool implemented June 7, 2020, so that does not help Morse or the employees in that part of the subgroup. Thus, the Court denies summary judgment on this Count for the second subgroup employed from May 10 to June 6, 2020.

Fifty West's improper inclusion of non-tipped employees invalidates its use of the tip credit. Thus, the Court need not address whether Fifty West provided

---

[13] Defendants do not admit this characterization to the extent that "informally" is vague. The Court, however, presumes that Defendants agree there was no formal tip pool of the kind implemented June 7.

inadequate notice (or whether that question is even properly before the Court). Accordingly, Plaintiffs have established that there are no genuine disputes of material facts on this issue, and they are entitled to summary judgment on Count II as a matter of law, except for the employees in the subgroup employed from May 10 to June 6, 2020.

### 3.    Count III - Failure to Pay Minimum Wage Under Ohio Law.

At first glance, Plaintiff's third claim for failure to pay minimum wage is the same as its second claim, just under Ohio law instead of the FLSA. (Doc. 1, #11–12). Defendants, however, raise different arguments that, essentially, the minimum wage provision of the Ohio Constitution does not incorporate all of the FLSA's tip-credit provisions. (Doc. 83-1, #1854–57). Therefore, they argue that they are not liable on this Count simply because they were liable under the FLSA. (*Id.*). Morse, however, also moves for summary judgment on this count and argues that Ohio's minimum wage provisions are interpreted in line with the FLSA. (Doc. 84, #1913–14).

Ohio's Constitution requires employers to pay employees a minimum wage, currently set at $8.70 per hour. Ohio Const. art. II, § 34a. As under the FLSA, an employer can pay tipped employees a tip-credit wage:

> An employer may pay an employee less than, but not less than half, the minimum wage rate required by this section if the employer is able to demonstrate that the employee receives tips that combined with the wages paid by the employer are equal to or greater than the minimum wage rate for all hours worked.

*Id.* Defendants argue that this provision simply requires an employee be paid at least $8.70 per hour between the wage paid by the employer and tips, and that it does not

34

incorporate the tip-pool regulations. (Doc. 83-1, #1854–57). And "Plaintiffs' counsel stipulated that Plaintiffs are not claiming anyone was paid lower than Ohio's minimum wage if tips are added to the hourly rate wages the Plaintiffs received." (*Id.* at #1855 (citing Doc. 58, #544)). So the issue is whether the fact that Fifty West could not take the tip credit under the FLSA also means that Fifty West violated this Ohio constitutional provision.

The text of the Ohio Constitution relies on the FLSA at some parts, but it also expressly differentiates its minimum wage provision at others. For example, it states that "[a]s used in this section: 'employer,' 'employee,' 'employ,' 'person' and 'independent contractor' have the same meanings as under the federal Fair Labor Standards Act." Ohio Const. art. II, § 34a. On the other hand, it also states that "[o]nly the exemptions set forth in this section shall apply to this section." *Id.* Because the tip credit is an exemption to the standard minimum wage requirement, the provision could mean that the basic description above is all that counts, not any additional FLSA regulations.

But whatever the merits of that argument might be as a matter of first impression, it is no longer a matter of first impression. The Supreme Court of Ohio, the last word on the Ohio Constitution, has already expressly considered it and ruled that "[t]he Fair Minimum Wage Amendment incorporates the FLSA without any limitation." *Haight v. Minchak*, 58 N.E.3d 1135, 1139 (Ohio 2016). Relying on the Constitution's language incorporating the "meanings," plural, of employee under the FLSA, the Court held that "the entirety of the FLSA is to be considered when

determining who is covered under its protections." *Id*. While Defendants here argue that the drafters would have expressly included any exemptions if they meant to incorporate them, (Doc. 83-1, #1856), the *Haight* court found that "it is logical to conclude that the drafters did not need to restate the FLSA exemptions [in this section] because those exemptions had already been incorporated." 58 N.E.3d at 1140. To be sure, *Haight* was not a tip-credit case. But given *Haight*, "[f]ederal and state courts have repeatedly concluded that Ohio law incorporates the FLSA's definitions, standards, and principles for its minimum wage and overtime compensation provisions." *Haase v. Cameron Mitchell Rests., LLC*, No. 2:23-cv-1316, 2024 WL 23159, at *10 (S.D. Ohio Jan. 2, 2024) (internal quotation marks omitted); *Craig v. Landry's, Inc.*, No. 1:16-cv-277, 2016 WL 3406032, at *3 (S.D. Ohio June 21, 2016) (evaluating tip-credit claim under both FLSA and Ohio Minimum Fair Wage Standards Act because they "are subject to the same standards and may be analyzed concurrently"); *see Hutchison v. Honeymoon Corp.*, No. CV-2020-05-1563, 2021 Ohio Misc. LEXIS 3482, at *8 (Ct. Com. Pl. June 11, 2011) (analyzing whether employer violated Ohio law by not providing proper notice of employer taking the tip credit, as required by the FLSA).

Because Ohio courts read the FLSA and Ohio minimum wage provision concurrently, the Court also finds that Defendants violated Ohio law on this front. Thus, the Court grants summary judgment in favor of Plaintiff on Count III.

**4.    Count IV - Untimely Payment of Wages in Violation of Ohio's Prompt Pay Act.**

Morse next claims that Defendants violated Ohio's Prompt Pay Act (the OPPA), Ohio Revised Code § 4113.15. (Doc. 1, #12). The OPPA requires employers to promptly pay its employees "the wages earned by them." Ohio Rev. Code § 4113.15(A). The statute generally sets a semi-monthly schedule to ensure such prompt payment, except for in circumstances not relevant here. *Id.* And:

> [w]here wages remain unpaid for thirty days beyond the regularly scheduled payday … and no contest[,] court order[,] or dispute of any wage claim[,] including the assertion of a counterclaim[,] exists accounting for nonpayment, the employer, in addition, as liquidated damages, is liable to the employee in an amount equal to six per cent of the amount of the claim still unpaid and not in contest or disputed or two hundred dollars, whichever is greater.

Ohio Rev. Code § 4113.15(B).

Morse claims that Defendants failed to timely pay employees (1) the full minimum wage, because Fifty West improperly paid them a tip-credit wage, and (2) the tips left by customers that were wrongly distributed to the kitchen staff constitute "wages earned by them." (Doc. 1, #12–13).

Defendants move for summary judgment on this count, arguing that if the wages are disputed, then employees cannot recover under this statute. (Doc. 83-1, #1863–65). Morse, likewise, requests summary judgment, arguing that his OPPA claim "rises and falls with claims under the FLSA". (Doc. 84, #1914–15 (internal quotation marks and citations omitted)). In other words, according to Morse, if he succeeds on his FLSA claims, which the Court found he largely does, *see* supra Law & Analysis (L&A), Parts A.1 and A.2, then he should also succeed on this claim. In

response to Defendant's argument about disputed wages, Morse argues that that provision only applies to whether a plaintiff can recover liquidated damages—not whether the claim itself is viable or whether he can recover actual damages. (Doc. 89, #2064–66).

The Court finds that the bona fide dispute over whether Defendants owe wages prevents any recovery under the OPPA. The Sixth Circuit addressed the availability of liquidated damages in *O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 567 (6th Cir. 2009), *abrogated on other grounds by Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016). The plaintiffs sought liquidated damages under the OPPA, and the district court found that a dispute existed, which barred recovery. *Id.* at 577. The Sixth Circuit agreed, noting that "Ohio law requires that a dispute accounting for nonpayment precludes the award of liquidated damages to a wage claimant." *Id.* (citation omitted). While that holding specifically applied to liquidated damages, the court also stated that "if plaintiffs had evidence that the wages were withheld even though defendants conceded or reasonably had to concede that the wages were due, such evidence—like evidence about clerical glitches or cash-flow problems—could create a triable issue of fact on the Prompt Pay Act claim." *Id.* at 579. Even though it was not the issue of the case, that statement implies that a lack of a good faith dispute is necessary to move forward on an OPPA claim.

*O'Brien* relied on an Ohio court case, *Haines & Co., Inc. v. Stewart*, that concerned a dispute over whether commissions constituted wages under the OPPA. No. 2000CA00138, 2001 WL 166465, at *3 (Ohio Ct. App. Feb. 5, 2001). Regardless of

that issue, however, "this case constituted a contest over a wage claim, and accordingly, R.C. 4113.15, the Prompt Pay Act, does not apply to this case." *Id.* Admittedly, *O'Brien* also cited another Ohio case that exclusively addressed liquidated damages. *Fridrich v. Seuffert Constr. Co. Inc.*, 2006-Ohio-1076, ¶ 23 (8th Dist.) ("Since an actual dispute existed as to [the employee's] unused vacation pay, [the Court] finds [the employer] is not liable for liquidated damages."). But the dispute-limitation does not appear to exclusively apply to liquidated damages. *See Brown v. Fukuvi USA Inc.*, 2022-Ohio-1608, ¶ 94 (2d Dist.) ("We do note that the better phrasing about disputed claims would be that a party may bring PPA claims even if a dispute exists over whether the wages in question are owed. However, recovery, including the right to liquidated damages, depends on whether lack of a legitimate dispute exists as to the wages in question.").

Morse urges the Court to adopt a reading of the statute that differentiates between liquidated damages and actual damages. Morse particularly relies on *Monahan v. Smyth Automotive, Inc.*, which addressed this precise argument. No. 1:10-cv-48, 2011 WL 379129, at *9 (S.D. Ohio Feb. 2, 2011). There, the court found that the defendant's argument that a dispute completely bars recovery "would render 4113.15 impotent because any suit under 4113.15 necessarily means that a dispute about wages exists." *Id.* Additionally, the court found that the Ohio legislature would not have intended to limit the statute in this way. *Id.*

Here, the Court disagrees with this conclusion for two main reasons. First, *O'Brien* gave three examples of how an employee could still recover: if there were

39

"clerical glitches," "cash-flow problems," or the employer conceded the wages were due. 575 F.3d at 579. In the cash-flow situation, for example, the employer would not have underpaid the employee because it disputed whether the wages were due, but rather because the employer lacked the requisite funds. In that situation, the employer would still be liable under the OPPA. Second, the court in *Monahan* presumed that a separate cause of action existed under section (A) of the statute. 2011 WL 379129, at *9. This Court, however, agrees with several other district courts that "Section 4113.15(A) defines the time frame in which an employer must pay its employees their wages earned and Section 4113.15(B) describes the liquidated penalty for not paying wages in the time proscribed by the statute." *In re Lowe's Cos., Inc. Fair Labor Standards Act & Wage & Hour Litig.*, 517 F. Supp.3d 484, 514 (W.D.N.C. 2021); *see Garner v. Cleveland Clinic Found.*, 735 F. Supp. 3d 867, 879–80 (N.D. Ohio 2024) (agreeing with *In re Lowe's*). And while the Court is not bound to follow other district courts, the majority of courts have found that an OPPA claim is completely unavailable where a dispute exists. *See, e.g., Terry v. Pro-Mark Contracting, LLC*, No. 1:14-cv-2542, 2016 WL 3421399, at *6 (N.D. Ohio June 22, 2016) ("The Prompt Pay Act, O.R.C. § 4113.15, does not apply to disputed wages."); *Sutka v. Yazaki N. Am. Inc.*, 256 F. Supp. 3d 677, 682 (E.D. Mich. 2017) ("To the extent that *Monahan* stands for the proposition that barring OPPA claims based on disputed wages undermines the statute itself, *Monahan* is in conflict with *O'Brien*, and *O'Brien*'s interpretation of the OPPA is binding on this Court.").

40

Because the Court finds that a plaintiff cannot recover under the OPPA when the wages are in dispute, Morse's claim fails as a matter of law. So the Court grants summary judgment in favor of Defendants on this claim.

### 5.    Count V – Damages Under Ohio Revised Code § 2307.60.

In Count V, Morse raises a claim for damages under Ohio Revised Code § 2307.60, which allows "[a]nyone injured in person or property by a criminal act … [to] recover full damages in[] a civil action unless specifically excepted by law." (Doc. 1, #13–14). And if "section 2315.21 or another section of the Revised Code" authorizes it, plaintiffs may recover punitive or exemplary damages. Ohio Rev. Code § 2307.60(A)(1). Here, Morse relies on a provision of the FLSA, 29 U.S.C. § 216(a), which imposes criminal penalties on an employer who willfully violates the FLSA, to constitute the underlying criminal statute. (Doc. 1, #13). And Morse seeks compensatory and punitive damages. (*Id*. at #14).

Only Defendants request summary judgment on this count. (Doc. 83-1, #1867–69; *see* Doc. 84, #1891 (expressly not moving for summary judgment on § 2307.60)). Defendants seem to argue that the FLSA claims already provide for compensatory damages, so the only additional damages sought via § 2307.60 are punitive damages. (Doc. 83-1, #1867–68). The problem is that punitive damages are only available if § 2315.21 or another section permits them. (*Id*.). Defendants point out that § 2315.21 only applies to tort actions, while this is a contract issue. (*Id*. at #1868). In his Complaint, Morse does not cite to a section of the Ohio Revised Code to support his request for punitive damages.

41

While the parties argue over whether the FLSA preempts § 2307.60 and prevents recovery at all, the Court finds summary judgment is inappropriate here for a more basic reason. Morse relies on 29 U.S.C. § 216(a) as the underlying criminal act. (Doc. 1, #13). That statute imposes criminal penalties only if the employer *willfully* violated the FLSA. 29 U.S.C. § 216(a). Yet neither side addressed in their briefing whether Defendants acted willfully. So Defendants have failed to show that Morse lacks evidence on this point, which they have the burden to do as the sole party requesting summary judgment on this Count. And Morse has introduced some evidence on other claims, such as how the reason for Defendants retaining tips is simply that they "lost track of it," (Doc. 70, #991), which does not foreclose the possibility that Defendants acted willfully. Thus, the Court denies summary judgment on Count V.

### 6.    Count VI - Unjust Enrichment.

Lastly, only Defendants move for summary judgment on Morse's unjust enrichment claim. (Doc. 83-1, #1865–67). Under Ohio common law, "[u]njust enrichment occurs when a person 'has and retains money or benefits which in justice and equity belong to another.'" *Johnson v. Microsoft Corp.*, 834 N.E.2d 791, 799 (Ohio 2005) (quoting *Hummel v. Hummel*, 14 N.E.2d 923, 927 (Ohio 1938)). To succeed on an unjust enrichment claim, a plaintiff must show "(1) a benefit was conferred by the plaintiff on the defendant, (2) the defendant had knowledge of the benefit, and (3) the defendant retained the benefit under circumstances in which it was unjust to do so without payment." *Bunta v. Superior VacuPress, L.L.C.*, 218 N.E.3d 838, 848 (Ohio

42

2022) (citing *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984)). A benefit conferred does not necessarily suffice though; "plaintiffs must go further and show that under the circumstances they have a superior equity so that as against them it would be unconscionable for the defendant to retain the benefit." *Longmire v. Danaci*, 155 N.E.3d 1014, 1024 (Ohio Ct. App. 2020) (cleaned up) (citation omitted).

In the Complaint, Morse alleges that he and other employees conferred a benefit by "actively participating in the operation of Defendants' business." (Doc. 1, #14). Further, Morse claims that he is entitled to withheld tips and restitution of the minimum wage lost because of the invalid tip pool. (*Id.*).

Defendants first take issue with whether Morse actually conferred a benefit on them. Specifically, they argue that "[a]n employee performing work that he/she was hired to perform is not the type of 'benefit' contemplated by an unjust enrichment clam." (Doc. 83-1, #1866). Additionally, Defendants argue that "no benefit [was] conferred to Defendants" because all tips were distributed to other employees. (*Id.*). In response, Morse does not cite any caselaw, but argues that it would be unjust for Defendants to retain tips when it is expressly forbidden under the FLSA. (Doc. 89, #2067). Even if Defendants did not pocket the tips, Morse asserts that wrongfully distributing the tips allowed "Defendants to use those tips to increase the wages Defendants paid to kitchen staff … reduced the Defendants' static wage commitment to the kitchen staff or enabled Defendants to attract and retain competent kitchen staff with higher pay." (*Id.*).

The Court finds that Defendants have the better argument in that unjust enrichment claims are inappropriate where contract law already covers the disputed amount. Another court in this district addressed an employer's counterclaim that it had conferred benefits on an employee (in the form of wages) even though that employee violated the company's policy and damaged its property (for which the company was seeking recompense from the employee). *Shively v. MPW Indus. Water Servs., Inc.*, No. 2:10-cv-10, 2010 WL 2696806, at *3 (S.D. Ohio July 6, 2010). There, the court stated:

> Under O.R.C. § 4113.15, [the employee] was entitled to his wages and benefits for work performed as a matter of law. An agreement between an employer and an employee, that the employee perform certain tasks as part of the job and be paid a certain wage and benefits for that work, is a type of contract, not a type of "benefit" allowed by unjust enrichment.

*Id.* In other words, payments made pursuant to a contractual obligation are not benefits conferred for purposes of an unjust enrichment claim. True, here the parties are reversed—Morse as employee claims that Defendants as employers wrongfully retained his wages. But the same principle applies. Morse has an adequate remedy as a matter of law without turning to unjust enrichment as an equitable solution. "Ohio law has consistently held that where there is an adequate remedy at law, an equitable remedy is improper." *Coventry Courts, LLC v. Cuyahoga Cnty.*, 212 N.E.3d 373, 380 (Ohio Ct. App. 2023) (quoting *McNulty v. PLS Acquisition Corp.*, 2002-Ohio-7220, ¶ 80 (8th Dist.)); *see also Duffie v. The Mich. Grp., Inc.*, No. 14-cv-14148, 2016 WL 28987, at *17 (E.D. Mich. Jan. 4, 2016) (dismissing unjust enrichment claim because "Plaintiff's FLSA claim covers the same subject matter—[overtime]—and

44

would provide a full, complete, and adequate remedy that would mirror and exceed the remedy plaintiff seeks under her unjust enrichment claim."). This Court likewise holds that Morse has an adequate remedy at law under both the FLSA and the above Ohio law claims, so unjust enrichment is not a proper remedy. Thus, the Court grants summary judgment in favor of Defendants.

### 7. Damages-Related Matters.

Morse also moves for summary judgment on several damages-related matters: (1) whether the Slatterys are personally liable as employers for violations of the FLSA, (2) what kind of damages are available under the FLSA, and, similarly, (3) what kind of damages are available under Ohio law. (Doc. 84, #1912–13, 1915–18). Morse, however, does not request any specific amount in damages at this time.

### a. Slatterys' Personal Liability.

Morse claims that both Bobby and Bob Slattery are employers under the FLSA and thus are personally liable. (*Id.* at #1912–13). Defendants only contest whether Bob Slattery, the father, is personally liable. (Doc. 87, #1996–97). Therefore, the Court presumes that Defendants concede Bobby Slattery can be found personally liable as an employer under the FLSA, and so grants summary judgment in favor of Morse on that issue. The Court, however, concludes that Bob Slattery is not personally liable, and so denies Plaintiff's motion there.

The FLSA defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). It does not limit liability to only one individual or entity either; multiple individuals can be

"simultaneously responsible" under the FLSA. *Fegley v. Higgins*, 19 F.3d 1126, 1131 (6th Cir. 1994). The Sixth Circuit uses the "economic reality" test to determine if a party is an employer. *Id.* Under that test, "a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation." *Id.* (citing *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 965 (6th Cir. 1991)). In *Dole*, for example, the court determined an individual defendant constituted an employer because he "was the chief corporate officer, had a significant ownership interest in the corporation, and had control over significant aspects of the corporation's day-to-day functions, including determining employee salaries." 942 F.2d at 966 (citation omitted). This was true even though a lower-level employee handled day-to-day operations as well. *Id.* Rather, an individual "need only have operational control of *significant aspects* of the corporation's day to day functions." *Id.* (internal quotation marks omitted) (emphasis in original).

The Sixth Circuit has noted a number of factors relevant to this inquiry: (1) "whether the plaintiff is an integral part of the operations of the putative employer"; (2) "the extent of the plaintiff's economic dependence on the defendant"; (3) "the defendant's substantial control of the terms and conditions of the work of the plaintiff"; (4) "the defendant's authority to hire or fire the plaintiff"; and (5) "whether the defendant maintains the plaintiff's employment records and establishes the rate and method of payment." *Ellington v. City of East Cleveland*, 689 F.3d 549, 555 (6th Cir. 2012) (internal citations and quotation marks omitted). At the end of the day, though, a court must take a "case-by-case approach." *Id.*

46

Here, the Court finds that Bob Slattery is not an employer because he was not involved in the day-to-day operations of Fifty West. True, Bob Slattery owns 50% of Fifty West as well as the underlying real estate, and so he is a "top man" in that sense. *See Dole*, 942 F.3d at 966; (Doc. 70, #960; Doc. 75, #1769). But both Bob and Bobby stated that Bob is not involved in the day-to-day operations, let alone "significant aspects" of those operations. *See Dole*, 942 F.3d at 966; (Doc. 70, #1018, 1054; Doc. 75, #1771). He does not set the terms and conditions of the employees' work, such as their pay, does not have authority to hire or fire employees, and cannot access Fifty West's shift-scheduling system or order system. (Doc. 70, #1018; Doc. 75, #1771–73). His seemingly only involvement is in going over the company's financials once a year. (Doc. 75, #1772). That's not enough.

Morse points to two pieces of evidence as 'proof' that Bob Slattery is an employer. (Doc. 84, #1913). First, Morse highlights an email where Charlie Severe, Bob's assistant, sent Bob an agenda for a bar staff meeting. (Doc. 70-12; *see* Doc. 70, #1056 (identifying Severe)). Second, he points out that Theresa Ansberry works as human resources director for the Slatts Group, where she "oversee[s] HR for all companies owned by the Slattery family, including Fifty West," and in that role, she directly reports to Bob. (Doc. 84, #1913 (citing Ansberry Dep., Doc. 82, #1807, 1811)). But that evidence does not demonstrate that Bob had control over "significant aspects" of Fifty West and its employees. For the email, there is no evidence that Bob responded in any way or otherwise took action with respect to the meeting. And even if he did, participation in that one event does not establish "significant" involvement.

47

As for Ansberry, while she handled the HR side of "[o]n-boarding, terminations, and benefits," this does not mean that she (or Bob) had authority to hire or fire people. (Doc. 82, #1810). And she expressly stated that she was not involved in payroll or creating the tip pool policy, beyond confirming that payroll included the proper benefits. (*Id.* at #1810–11). Even if this evidence shows that Bob Slattery had more involvement than he stated, this is still far below the level of control found in *Dole* or *Fegley*. Thus, the Court declines to hold Bob personally liable.

### b. FLSA Damages.

Section 216(b) of the FLSA states that "[a]ny employer who violates [the FLSA's minimum wage or overtime provisions] shall be liable to the employee or employees affected in the amount of their unpaid minimum wages … and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). More specifically for tip-credit violations under § 203(m)(2)(B), "[a]ny employer … shall be liable to the employee or employees affected in the amount of the sum of any tip credit taken by the employer *and* all such tips unlawfully kept by the employer, and in an additional equal amount as liquidated damages." *Id.* (emphasis added).

The FLSA, however, also established a carve-out for liquidated damages: "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA] … the court may, in its sound discretion, award no liquidated damages." 29 U.S.C. § 260. The court is not to take this step lightly, though. "This burden on the employer is substantial and requires

48

proof that the employer's failure to obey the statute was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon it more than a compensatory verdict." *Sec'y of Lab. v. Timberline S., LLC*, 925 F.3d 838, 856 (6th Cir. 2019) (cleaned up) (quoting *Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 840 (6th Cir. 2002)).

Morse claims that he and other employees are entitled to the balance of the minimum wage (the difference between the tip-credit wage and full minimum wage), the tips withheld by Defendants, and liquidated damages. (Doc. 84, #1915–18). Furthermore, Morse argues that Defendants did not act in good faith or on reasonable grounds, so they should not benefit from the potential carve-out. (*Id.* at #1915–17). Defendants, meanwhile, argue that to recover under § 216(b), Morse needs to establish that Defendants improperly used the tip-credit *and* that Defendants kept those tips. (Doc. 87, #2001). But Defendants maintain that they did not do both, at least not at the same time. (*Id.*).

Start with the balance of the minimum wage and the withheld tips. The Court disagrees with Defendants that § 216(b) imposes two requirements that a plaintiff must satisfy in order to recover. Section 216(b) only describes the damages that an employee *can* recover from an employer and provides a private cause of action. *See* 29 U.S.C. § 216(b) (titled "Damages; right of action; attorney's fees and costs; termination of right of action"). Section 203(m)(2)(B) defines the violation itself and thus what an employee would need to prove to succeed on this claim. In other words, § 216(b) merely specifies the *amount* for which the employer is liable, not *whether* the

49

employer is liable. And it says that amount is both (1) "the sum of any tip credit taken by the employer," and (2) "all such tips unlawfully kept by the employer." 29 U.S.C. § 216(b). Because the Court already found that Defendants violated § 203(m)(2)(B), *see* supra L&A, Parts A.1, A.2, Morse and the other opt-in Plaintiffs can recover both of these categories.

That said, there are two subgroups at issue here, and to some extent, they are entitled to different recoveries. The first subgroup, employees who worked from March 16, 2020, to May 9, 2020, were not paid a tip-credit wage. But during that time frame, Defendants admit that they retained all $14,516.35 in tips collected from customers. (Doc. 83-2, #1874; Doc. 89-1, #2074). So while there is no tip-credit sum for the first subgroup to recover, they can recover the withheld-tips sum.

Now turn to the second subgroup, those employed from May 10, 2020, to June 5, 2021. Defendants improperly paid those employees a tip-credit wage, *see* supra L&A, Part A.2, so they are entitled to recover the sum of that tip credit.[14] As for the latter form of recovery, there is some debate about whether Defendants "kept" any tips during this time frame. Unlike the first subgroup, there are no allegations that Defendants directly retained the tips. Rather, the issue is whether the tips that Defendants wrongfully redistributed to the kitchen staff can be considered "all such tips unlawfully kept by the employer" for purposes of § 216(b). Morse points to the

---

[14] As the Court discussed above, summary judgment is not appropriate for those employed from May 10 to June 7, 2020, because the invalid tip pool was only implemented starting June 7, 2020. *See* supra L&A, Part A.2. So while the conditionally certified subgroup includes those employed from May 10 to June 7, 2020, those employees cannot recover.

50

FLSA's implementing regulations that state, "[a]n employer does not violate section 3(m)(2)(B)'s prohibition against keeping tips if it requires employees to share tips with other employees *who are eligible* to receive tips." 29 C.F.R. § 531.54(b)(1) (emphasis added). Morse maintains that this suggests that the opposite is also true— "if the employer does require employees to share tips with employees who are *not* eligible to receive tips, the employer has violated the prohibition against keeping tips." (Doc. 91, #2123 (emphasis in original)). This comports with other provisions that an employer can only require an employee to participate in a tip pool with employees who customarily and regularly receive tips. (*Id.* (citing 29 C.F.R. § 531.54(c)).

The Court agrees with Morse that wrongfully distributing the tips collected from properly tipped employees violates Section 203(m)(2)(B), as well as its implementing regulations, and so Morse can recover the amount of wrongfully distributed tips under § 216(b). While this does not necessarily fit the ordinary sense of "keep," like the tips that Defendants retained related to Subgroup 1, Defendants still wrongfully withheld those tips from the employees to whom the tips should have gone. Because the statute and regulations make it clear that Defendants cannot distribute tips to employees who do not "customarily and regularly receive tips," it does not make sense for the statute to exclude these wrongfully withheld tips from a plaintiff's recovery. Thus, the Court finds that Morse and the second subgroup can recover for this amount, in addition to the sum of the tip credit.

51

Last, for recovery under the FLSA at least, the Court finds that Plaintiff and the subgroups can recover liquidated damages. Defendants do not address liquidated damages beyond the arguments just described, and they certainly do not attempt to argue that they made a good faith effort to comply with the FLSA such as to escape liquidated damages. (*See* Doc. 87, #2000–01). And § 216(b) plainly states that employers are liable for liquidated damages "in an additional equal amount" to the sum of the tip credit taken by the employer and the unlawfully kept tips. So the Court finds for Plaintiff on this front as well.

### c.    Damages Under Ohio Law.

Morse addresses damages under § 34a of Ohio's Constitution as well as under the OPPA, § 4113.15, the two state-law claims to which he requests summary judgment. (Doc. 84, #1918). The Court has already determined that Morse cannot succeed on the OPPA claim, *see* supra L&A, Part A.4, so it does not address damages on that claim. As for § 34a, Morse requests back wages, the employees' costs, reasonable attorneys' fees, and damages equal to an additional two times the back wages. (Doc. 84, #1918). Defendants do not respond to this request. (*See* Doc. 87, #2002 (only addressing OPPA)). To briefly evaluate this claim, though, § 34a states:

> Where an employer is found by the state or a court to have violated any provision of this section, the employer shall within thirty days of the finding pay the employee back wages, damages, and the employee's costs and reasonable attorney's fees. Damages shall be calculated as an additional two times the amount of the back wages.

The Court already determined that Defendants violated § 34a, *see* supra L&A, Part A.3, so Morse properly requests these forms of recovery. So the Court grants Morse's motion on this front, too.

*   *   *

In sum, the Court **GRANTS** summary judgment in favor of Defendants on Count I with respect to Subgroup 2, Count IV, and Count VI. In turn, the Court **GRANTS** summary judgment in favor of Morse on Count I with respect to Subgroup 1, Count II, and Count III. The Court does not grant summary judgment on Count V. Furthermore, the Court **GRANTS IN PART** Plaintiff's motion in that the Court finds Bobby, but not Bob, Slattery personally liable, and **GRANTS** Plaintiff's motion on the remaining damages issues.

**B.    Class Certification.**

With the summary judgment motions settled, the Court turns to Morse's Motion for Class Certification (Doc. 85). Recall, the Court already conditionally certified the two subgroups for the FLSA collective action based on the parties' stipulation. (Doc. 29). The class certification, meanwhile, instead pertains to the state law claims, Count III through VI. And because the Court already granted summary judgment in favor of Defendants on Count IV and VI, *see* supra L&A, Parts A.4 and A.6, the class certification only pertains to the § 34a and § 2307.60 claims. Morse had previously moved for class certification, (Doc. 40), but the Court denied that motion because of a lack of evidence, (Doc. 47). For the present motion, the Court starts by addressing a few threshold matters before moving to the Rule 23 factors.

53

### 1.    Refining the Class Definition.

Before addressing the merits of the class certification, Defendants object that Morse cannot propose a refined class definition at this stage. (Doc. 88, #2023–25). Instead, they argue that Morse needed to move to amend his complaint before moving again to certify a class. (*Id.*). Morse, however, argues that refining class definitions over the course of the lawsuit is common in class actions, and so he is not required to amend his complaint. (Doc. 89, #2134–38).

The Court routinely revises class definitions without the plaintiff first moving to amend their complaint. Litigants also regularly propose modifications to class definitions. *Schorsch v. Hewlett-Packard Co.*, 417 F.3d 748, 750 (7th Cir. 2005). Indeed, the Court has overseen a case where the parties sought to alter the class definition when seeking preliminary approval, after the Court had already certified a class. *See Compound Prop. Mgmt. LLC v. Build Realty Inc.*, No. 1:19-cv-133, 2025 WL 4479439, at *8 (S.D. Ohio Mar. 31, 2025) (approving altered class definition). There, the Court noted that "district courts have broad discretion to modify class definitions … as the litigation progresses." *Id.* (bracket omitted) (quoting *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007)). In fact, when there is an issue with a class definition, that problem "can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis." *Sauter v. CVS Pharm., Inc.*, No. 2:13-cv-846, 2014 WL 1814076, at *6 (S.D. Ohio May 7, 2014) (quoting *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 814 (7th Cir. 2012)); *see also In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 (5th

54

Cir. 2004) (noting the "ongoing refinement and give-and-take inherent in class action litigation, particularly in the formation of a workable class definition").

True, Defendants cite several cases that require the plaintiff to amend their complaint, but those cases involved plaintiffs attempting to significantly alter the nature of the lawsuit. (Doc. 88, #2023–25). For example, Defendants assert that "[t]o accommodate a new proposed class definition, Plaintiffs will need to amend the complaint, requiring a further response from Defendants." (*Id.* at #2023 (quoting *Clarke v. Baptist Mem'l Healthcare Corp.*, 264 F.R.D. 375, 381 (W.D. Tenn 2009)). But in *Clarke*, the issue was that the plaintiffs had filed a motion to intervene to add a new plaintiff to serve as a class representative, after discovery had closed and the court had already denied class certification. 264 F.R.D. at 380–81. Additionally, the plaintiffs planned to file a new motion for class certification, including a new expert report. *Id.* So rather than simply refining the proposed class definition, the plaintiffs wished to significantly alter the case and would "require the Defendants to start from scratch." *Id.* at 381.

That case goes well beyond the type of refinement Morse proposes here. Previously, Morse sought to certify two classes that mirrored the FLSA subgroups:

> Class Action Subclass 1: All hourly employees who have been employed by Defendants as a bartender, cashier, or utility at any time between March 16, 2020, and May 9, 2020, during which time Defendants paid the minimum wage and during which time the employee did not receive all of the tips to which the employee was entitled.

> Class Action Subclass 2: All tip-credited employees (i.e., any employee who received a tip-credit wage, or in other words an hourly rate below the federal and state minimum wage, and as to whom the employer was relying on a tip credit (which is lawful to make up the difference between the hourly rate and the federal and state minimum wage)) who have

55

been employed by Defendants at any time between May 10, 2020, and
June 5, 2021, who participated in a tip pool with employees who do not
customarily and regularly receive tips and/or who did not receive all of
the tips to which they were entitled.

(Doc. 47, #379). In the instant motion, Morse drops the first subclass entirely, largely

due to numerosity concerns identified in the Court's previous opinion. (*See* Doc. 85,

#1958 n.3). And Morse proposes the following class instead:

All hourly employees who received a cash hourly rate below the state
and federal minimum wage, and for whom Defendants took a tip credit
to make up the difference between the cash hourly rate and the state
and federal minimum wage, who have been employed by Defendants at
any time between May 10, 2020 and June 5, 2021.

(*Id.* at #1941). The revised definition does not significantly vary from the original,

such as by adding new theories of the case, new named plaintiffs, or any other

dramatic change. The main difference is that the newly proposed definition drops the

final phrase regarding the invalid tip pool, which may actually serve to prevent the

definition from creating an impermissible fail-safe class, another concern the Court

raised previously. (Doc. 47, #388–89). Whether this difference permits the proposed

class definition to survive Rule 23 is a question the Court discusses below. But as far

as whether this change requires amending the complaint, it does not approach the

scale of alteration at issue in *Clark*.

Defendants argue this failure to amend is "egregious" because if he had done

so, "the parties would have had the obvious benefit of being able to then tailor the

considerable amount of discovery both sides needed to undertake." (Doc. 88, #2024).

As Morse points out, though, Defendants do not offer any examples of discovery they

would have pursued or how they would otherwise be prejudiced by the current

56

proposed class definition. (Doc. 92, #2137). Unlike *Clark*, for example, Defendants do not have to analyze a new expert report or new proposed class representative. Instead, "Defendants have been aware from the very inception of this case that Plaintiff was alleging FLSA and state law violations based on an improper tip pool on behalf of himself and all similarly situated hourly employees for the stated time frame." (*Id.* at #2138). So the Court will proceed to analyze the revised definition.

### 2. Sufficiently Definite.

The Court must address another threshold issue: whether the proposed class is sufficiently definite. "Before a court may certify a class pursuant to Rule 23, the class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537–38 (6th Cir. 2012) (citation omitted). "[I]mportant elements of defining a class include: (1) specifying a particular group at a particular time frame and location who were harmed in a particular way; and (2) defining the class such that a court can ascertain its membership in some objective manner." *Edwards v. McCormick*, 196 F.R.D. 487, 491 (S.D. Ohio 2000) (citing *Crosby v. Soc. Sec. Admin.*, 796 F.2d 576, 580 (1st Cir. 1986)).

Defendants argue that the new class definition is overbroad because it includes employees at Fifty West's other locations as well as Bob Slattery's individual employees. (Doc. 88, #2025–27). Additionally, they challenge Morse's reference to the federal minimum wage when the class only relates to the state law claims. (*Id.* at #2026–27). In response, Morse proposes revising the class definition to expressly

57

apply only to Fifty West's Cincinnati Burger Bar location. (Doc. 92, #2139–40). Morse argues that this is not strictly necessary, though, because the proposed class definition only covers employees who were paid a tip-credit wage, and Defendants' other employees were not paid in that manner. (*Id.* at #2139).

The Court agrees that altering the class definition to specify the location is the most direct way to address Defendants' concerns. The Court already noted that it has broad discretion to revise a proposed class definition. *Powers*, 501 F.3d at 619. As for Defendants' concerns about the class definition referring to the federal minimum wage, Morse defines the class as employees "for whom Defendants took a tip credit to make up the difference between the cash hourly rate and the state and federal minimum wage." (Doc. 85, #1941). Defendants are admittedly correct in observing that the class only involves state-law claims (the FLSA claims involve a collective action instead). But Defendants err to the extent that they argue that the state and federal claims are entirely separate. As the Court explained in evaluating the § 34a claim, *see* supra L&A, Part A.3, the claim "rises and falls" with the FLSA. *Craig*, 823 F.3d at 385 n.1. In other words, it is the impropriety of the tip pool under federal standards that invalidates the tip credit under state law. So reference to the federal minimum wage does not seem completely out of place. At any rate, it does not render the proposed class overbroad so as to defeat class certification.

With those preliminary issues settled, the Court turns to the Rule 23(a) factors.

### 3. Rule 23(a) Requirements.

Recall, Rule 23 allows a class to be certified only if:

(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). On top of the four Rule 23(a) requirements, each of which must be met, a class also must satisfy one of Rule 23(b)'s conditions. Morse relies on Rule 23(b)(3), (Doc. 85, #1957), which requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Morse must make these showings as to each claim for which they seek certification. *See Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 976 (5th Cir. 2000) ("[A] court should certify a class on a claim-by-claim basis, treating each claim individually and certifying the class with respect to only those claims for which certification is appropriate."). Here, the Court finds that these requirements are met.

### a. Numerosity.

First, the Court finds that numerosity is satisfied. "There is no strict numerical test for determining impracticability of joinder." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996) (citation omitted). And "while 'the exact number of class members need not be pleaded or proved, impracticability of joinder must be positively shown, and cannot be speculative.'" *Golden v. City of Columbus*, 404 F.3d 950, 965–

66 (6th Cir. 2005) (quoting *McGee v. E. Ohio Gas Co.*, 200 F.R.D. 382, 389 (S.D. Ohio 2001)).

Here, Morse proposes a class of over 150 potential members. (Doc. 85, #1958). In fact, the parties previously stipulated that between March 2020 and June 5, 2021, Fifty West employed over 150 people "as bartenders, cashiers, and expos." (Doc. 39-1, #299). And while the Court previously denied class certification, it still recognized that numerosity was met because joinder of all members would be impracticable. (Doc. 47, #389).[15] So the Court finds this element is satisfied.

### b. Commonality.

"To demonstrate commonality, the plaintiffs' 'claims must depend on a common contention … of such a nature that it is capable of class wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Young*, 693 F.3d 523, 542 (6th Cir. 2012) (quoting *Dukes*, 564 U.S. at 350). "[W]hen the legality of the defendant's standardized conduct is at issue, the commonality factor is normally met." *Castellanos v. Worldwide Distrib. Sys. USA, LLC*, No. 2:14-cv-12609, 2016 WL 11678220, at *6 (E.D. Mich. June 20, 2016) (quoting *Gilkey v. Cent. Clearing Co.*, 202 F.R.D. 515, 521 (E.D. Mich. 2001)). Although similar to Rule 23(b)'s predominance requirement, commonality presents a lower threshold of inquiry. *See Amchem*, 521 U.S. at 609.

---

[15] The Court had noted that numerosity was not satisfied for a subclass of employees working from March 16, 2020, to May 9, 2020. (Doc. 47, #389–90). In the current motion, though, Morse drops this subclass. (*See* Doc. 85, #1958 n.3).

The Court agrees that Morse met the commonality requirement with respect to the § 34a minimum wage claim and the § 2307.60 claim. As the Court described above, *see* supra L&A, Part A.2, Defendants implemented a policy across all non-kitchen employees to pay them a tip-credit wage while including ineligible employees, (*see* Doc. 70-11 (message implementing new tip policy)). The tip-credit wage was not applied on an individual basis; Defendants uniformly applied it across all front-of-house employees from May 10, 2020, to June 5, 2021. (Doc. 83-2, #1874–75; Doc. 89-1, #2074). In other words, the Court's analysis above was not specific to Morse. And as the Court noted there, it does not need to evaluate the adequacy of the notice because the tip pool was invalid based on the inclusion of the kitchen staff. So while the Court raised concerns about individual notice in its previous Opinion and Order denying class certification, (Doc. 47, #386–87), that determination proved to be unnecessary to find Defendants improperly took the tip credit and thus paid employees the wrong wage. Likewise, the Court already addressed that employees cannot be characterized as voluntarily sharing their tips with the otherwise-ineligible kitchen staff because Defendants imposed the tip pool as a formalized arrangement, not one that employees mutually agreed upon. *See* supra L&A, Part A.2. So any previous concerns about the individualized nature of consent are reduced. And, while these considerations rest on federal standards, the § 34a claim turns on the FLSA claim.

As for the § 2307.60 claim, even though the Court has not granted summary judgment in favor of either party, the Court reasonably finds that whether

Defendants willfully violated the FLSA can be addressed on a class-wide basis. That determination would still turn on Defendants' decision to implement the policy restaurant-wide, and would not depend on a specific employee's circumstances.

That said, the Court acknowledges that difficulties may arise in determining each employee's damages. To be clear, damages related to paying the balance of the tip-credit wage and full minimum wage should not be particularly challenging. Rather, the difficulty lies in how to distribute the unlawfully withheld tips. The Court, however, still finds that class-wide resolution is the fairer way to adjudicate these issues. As Defendants have repeatedly argued, the major reason for their (invalid) tip pool is that many of the tips were left for online orders or after minimal interaction with a cashier. While any argument that the regulations should change in response to new tipping patterns are better directed at Congress or the DOL, it shows that the tips were not left for any specific employee. This is unlike, for example, tips left for a waiter alongside a check at the end of the meal. Morse does not seem to dispute this. If these claims were adjudicated individually, though, there would be challenges regarding what percentage of those unspecified tips should go to the single employee. Establishing a formula or some such system to distribute any unlawfully withheld tips to all tipped employees in the same suit will lead to a fairer distribution. Otherwise, one employee in an individual suit could receive a disproportionate share, or alternatively, a smaller share out of fear of that employee receiving a windfall. And in any event, "no matter how individualized the issue of damages may be, determination of damages may be reserved for individual treatment with the question

62

of liability tried as a class action." *In re Whirlpool*, 722 F.3d at 854 (cleaned up) (quoting *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988)). So this concern does not change the Court's conclusion.

### c. Typicality.

"[T]ypicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007) (quoting *Sprague*, 133 F.3d at 399). Typicality and commonality "tend to merge in practice." *In re Whirlpool*, 722 F.3d at 853 (cleaned up). "[A] necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members." *Young*, 693 F.3d at 542 (quoting *Sprague*, 133 F.3d at 399).

The named plaintiff's claim need not "always involve the same facts or law, provided there is a common element of fact or law." *Beattie*, 511 F.3d at 561 (quoting *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 n.31 (6th Cir. 1976)). And, as a general matter, "a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re Am. Med. Sys.*, 75 F.3d at 1082.

Morse's situation is typical of the class for the remaining state law claims, § 34a and § 2307.60. Fifty West employed him during the relevant time period and paid him a tip-credit wage. (Doc. 83-2, #1873–75; Doc. 89-1, #2072–74). Morse

63

received a share of the tips redistributed from the tip pool. In other words, he experienced the pay structure that he claims (and which the Court has already determined for § 34a, *see* supra L&A, Part A.3) violates state law. His experience, and Defendants' failure to properly compensate him, is representative of other employees' pay during this time period, so typicality is satisfied.

Defendants argue that Morse's lack of consent to the tip pool may not be representative of the class. But the Court already determined that the imposition of a formalized arrangement including ineligible employees is not, legally speaking, voluntary. So the Court does not credit this argument or find it overcomes the above showing of typicality.

### d. Adequacy.

That leaves the last Rule 23(a) requirement—adequacy. As the Sixth Circuit has explained, "commonality and typicality tend to merge with the requirement of adequate representation." *In re Whirlpool*, 722 F.3d at 853. To be adequate, two criteria must be met: "(1) the representative must have common interests with unnamed members of the class, and (2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *In re Am. Med. Sys.*, 75 F.3d at 1083 (quoting *Senter*, 532 F.2d at 525). "The adequacy inquiry … serves to uncover conflicts of interest between named parties and the class they seek to represent." *Beattie*, 511 F.3d at 562 (quoting *Amchem*, 521 U.S. at 625–26). "When the defendants have [a] defense unique to the named plaintiff, the named plaintiff will not meet the adequacy of representation element," at least where the

defendant has "put forth sufficient evidence to establish that the issue would be a focus of the litigation." *Washington v. Rossen, Varchetti & Oliver, PLLC*, No. 1:11-cv-945, 2016 WL 11631241, at *4 (W.D. Mich. Jan. 25, 2016) (citing *O'Neil v. Appel*, 165 F.R.D. 479, 493 (W.D. Mich. 1996)); *see also Schuh v. HCA Holdings, Inc.*, No. 3:11-1033, 2014 WL 4716231, at *11–12 (M.D. Tenn. Sep. 22, 2014) (refusing to find class representative inadequate when defendant's proposed defenses did not threaten to become the focus of litigation).

Separately, this inquiry also includes a peek into the competence and qualifications of class counsel and any potential conflicts of interest. *Gen. Tel. Co. of Sw.*, 457 U.S. at 157 n.13 (1982); *Senter*, 532 F.2d at 525. "In the absence of a showing to the contrary, adequacy of counsel is often presumed." *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Kelsey-Hayes Co.*, No. 2:11-cv-14434, 2015 WL 1906133, at *3 (E.D. Mich. Apr. 28, 2015) (quoting *Abby v. City of Detroit*, 218 F.R.D. 544, 548 (E.D. Mich. 2003)).

Here, Morse is an adequate representative. He has vigorously prosecuted the case since its inception in 2021. And he already is the class representative for the conditional collective action under the FLSA. Moreover, as already discussed, Morse has common claims to the members of the class and suffered the same kind of injury. And Defendants' have not presented any arguments unique to Morse besides the potential lack of consent, which the Court has already addressed. Finally, Morse proceeds with the aid of qualified counsel from Mezibov Butler, which has experience in wage and hour class actions. (Butler Decl., Doc. 85-1, #1980).

Defendants protest that Morse is inadequate "because his interests diverge from those of the proposed class with respect to how damages would be calculated." (Doc. 88, #2040). Specifically, they argue that Morse worked in the kitchen at times, and he is ineligible to receive tips for that time. Because that creates an incentive to minimize his amount of time spent in the kitchen, Defendants claim that "[t]his creates an inverse relationship between Plaintiff Morse's potential recovery and the recovery available to others." (*Id.*). While there could be such an incentive, it is unclear how this is different from the rest of the class. Indeed, if employees wore multiple hats, as Defendants repeatedly claim, (*see, e.g., id.* at #2034–35), then presumably some other employees worked in the kitchen occasionally, too. They would have the same incentive to minimize this time. Defendants allude to a "portion of the damages sought [that] are fixed sums," without further specifying. (*Id.* at #2040). So it is unclear if those fixed sums would turn on the amount of time spent in the kitchen at all. Some damages, such as the balance of the tip credit and minimum wage, for example, would not turn on this issue. So Defendants have not shown that Morse truly has a conflict with other members of the class, or that Defendants have unique defenses applicable only to him. Thus, the Court finds Morse is an adequate class representative.

### 4. Rule 23(b)(3).

Besides meeting the Rule 23(a) requirements, Morse must show that each claim qualifies under at least one Rule 23(b) category. Here, Morse proceeds under Rule 23(b)(3), which has two components: predominance and superiority. Both are

66

present here. The Court concludes that common class-wide questions will predominate even if some individual questions remain, and that class treatment is a superior method of adjudication.

### a.    Predominance.

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. (citation omitted). "To meet the predominance requirement, a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof." *Young*, 693 F.3d at 544 (quoting *Randleman v. Fid. Nat. Title Ins. Co.*, 646 F.3d 347, 352–52 (6th Cir. 2011)). But "[a] plaintiff class need not prove that each element of a claim can be established by class[-]wide proof." *In re Whirlpool*, 722 F.3d at 858 (citing *Amgen*, 568 U.S. at 468). Indeed, "[a] class may be certified based on a predominant common issue even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 460 (6th Cir. 2020) (citation and internal quotation marks omitted).

In deciding whether individual issues predominate over common questions, a court cannot rely on mere "speculation and surmise" that individual issues may arise. *Bridging Cmtys. Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1125 (6th Cir. 2016) (quoting *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000)). Rather, a court "should consider only those issues that would *likely* arise if an

67

individual class member's claims were being adjudicated on the merits." *Bais Yaakov of Spring Valley v. ACT, Inc.*, 12 F.4th 81, 89 (1st Cir. 2021) (emphasis added).

The Court has already granted summary judgment in favor of Morse on the § 34a claim, *see* supra L&A, Part A.3, but it declined to grant summary judgment on the § 2307.60 claim, *see* supra L&A, Part A.5. For both claims, though, the common questions predominate over any individualized issues. As Morse states, "all members of the purported class have been harmed by the same tip pool administered by the same small group of people based on a single tip pooling practice." (Doc. 85, #1974). That arrangement violated the FLSA, which in turn meant that Defendants failed to satisfy § 34a of Ohio's Constitution. *See* supra L&A, Part A.3. That analysis did not turn on any proof specific to Morse, and would apply equally to every employee paid a tip-credit wage during the relevant time frame. As for the § 2307.60 claim that provides for civil damages due to a criminal violation, the underlying criminal provision depends on whether Defendants willfully violated the FLSA. 29 U.S.C. § 216(a). That question does not require individualized proof either; it turns on whether unlawful implementation of the tip pool, across all employees, was willful. While the damages amounts may be different, again, the method for determining those damages will be the same. So the Court finds that predominance is satisfied.

### b. Superiority.

Now for superiority. Under Rule 23(b)(3), a plaintiff must show "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." More specifically, a court should consider: (1) "the class members'

68

interests in individually controlling the prosecution or defense of separate actions," (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members," (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum," and (4) "the likely difficulties in managing a class action." *See* Fed. R. Civ. P. 23(b)(3)(A)–(D).

The superiority analysis "aims to 'achieve economies of time, effort, and expense, and promote … uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 415 (6th Cir. 2018) (quoting *Amchem*, 521 U.S. at 615). "Use of the class method is warranted particularly [where] class members are not likely to file individual actions—the cost of litigation would dwarf any potential recovery." *In re Whirlpool*, 722 F.3d at 861. Potentially small individual recoveries to class members support the use of class treatment. *See Beattie*, 511 F.3d at 567.

Morse has shown that a class action is superior to other methods to litigate the state-law claims. Defendants do not even address superiority in their objections to class certification. To briefly explain why a class action is superior, though, as Morse notes, the "wages at issue on the individual class member level are likely to be relatively small," (Doc. 85, #1976), so "class members are not likely to file individual actions," *In re Whirlpool*, 722 F.3d at 861. There is no other ongoing litigation on these issues, which supports the notion that individual class members have minimal interest in controlling their own actions. Finally, the Court agrees that a class action

69

is a desirable and efficient manner to dispose of employees' allegations—individual actions relating to the same tip pool would be redundant and time consuming. Without offering argument to the contrary, Defendants seem to concede this point.

With that, the Court certifies the proposed class.

## C.    Class Counsel.

After certifying a class action, a court must appoint class counsel under Rule 23(g). Morse requests the Court appoint Brian Butler from Mezibov Butler as class counsel. (Doc. 85, #1977–78; Doc. 85-1). Defendants do not address, and therefore do not seem to object, to Butler's appointment. And the Court finds that Butler has experience in wage and hour litigation as well as class actions, including in front of this Court. (*See* Doc. 85-1). So the Court appoints Brian Butler, and more broadly the firm Mezibov Butler, as class counsel.

## D.    Class Notice.

Lastly, Morse requests the Court approve the proposed form of notice and authorize its mailing. (Doc. 85, #1978). Defendants, however, argue this would be premature because the Court has not yet ruled on the substantive summary judgment motions or class certification. (Doc. 88, #2042).

The Court cannot approve the current proposed notice. While the following issues are not exhaustive, they show how a revised notice is necessary. To start, the Court has refined the class to specifically cover only Fifty West's Cincinnati Burger Bar, instead of all of Defendants' employees. *See* supra L&A, Part B.1. Second, the notice states that "[a]t this time, the Court has not issued any decision as to who is

right and who is wrong." (Doc. 85-2, #1982). While that was accurate when Morse submitted this proposed notice, it is no longer so. Relatedly, the notice states that the Court certified the class with respect to all four state-law claims, including the OPPA and unjust enrichment claims. (*Id.* at #1983). Because the Court has now granted summary judgment in favor of Defendants on those claims, *see* supra L&A, Parts A.4 and A.6, the notice must be revised. Moreover, the notice repeatedly mentions the FLSA claims. Admittedly, the FLSA and state-law claims are not completely separate. That said, the class action only concerns the state-law claims, so simultaneous reference to the FLSA without further explanation may mislead potential class members. This is particularly concerning since class actions are opt-*out*, while FLSA collective actions are opt-*in*. In other words, an employee could have chosen not to opt-in to the collective action, and so think they did not need to opt-out of the class action. Conversely, an employee may read that they need not take action to recover under the class action, but not realize they needed to opt-in to recover directly under the FLSA.

In sum, the notice needs clarification. Thus, the Court rejects the proposed notice, but invites Morse to submit a revised notice for the Court's consideration.

## CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Partial Motion for Summary Judgment (Doc. 83) and Plaintiff's Partial Motion for Summary Judgment (Doc. 84). Specifically, the Court grants summary judgment in favor of Morse for Count 1 for the first subgroup,

71

Count II, and Count III. In turn, the Court grants summary judgment in favor of Defendants on Count I for the second subgroup, on Count IV, and on Count VI. The Court, however, declines to grant summary judgment on Count V. Beyond that, the Court determines that Bobby, but not Bob, Slattery is personally liable, and otherwise finds for Plaintiff on the damages issues.

Additionally, the Court **GRANTS IN PART** Plaintiff's Motion for Class Certification (Doc. 85). The Court certifies the proposed class definition, with the revision that it only applies to Defendant's Cincinnati location. The Court further appoints Morse as class representative and appoints Brian Butler as class counsel. The Court, however, does not approve of the proposed notice. Morse is welcome to move for leave to distribute notice again in the future though.

    **SO ORDERED.**

March 30, 2026
 **DATE**

      **DOUGLAS R. COLE**
      **UNITED STATES DISTRICT JUDGE**